IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 9, 2002 Session

## STATE OF TENNESSEE v. COREY MICKENS, CHRISTOPHER SMITH, MATTHEW DIXON, AND CHONCEY JONES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-02267-70     Joseph B. Dailey, Judge**

---

**No. W1999-01169-CCA-R3-CD  - Filed February 14, 2003**

---

The defendants, Corey Mickens, Christopher Smith, Matthew Dixon, and Choncey Jones, all members of the Gangster Disciples, were indicted for various offenses as the result of the kidnapping of Marshall Shipp and Ricky Aldridge and subsequent beating of Aldridge and murder of Shipp, both of whom also were Gangster Disciples.  Mickens was convicted of first degree murder in the perpetration of aggravated kidnapping and especially aggravated kidnapping of Shipp.  Smith, Dixon, and Jones were convicted of first degree premeditated murder and especially aggravated kidnapping of Shipp, and all four defendants were convicted of the especially aggravated kidnapping of Aldridge.  All four defendants were sentenced to life without the possibility of parole on the first degree murder charges.  Additionally, Mickens was sentenced to two consecutive twenty-two-year sentences for the two especially aggravated kidnapping charges.  Smith was sentenced to two consecutive forty-year sentences for the two especially aggravated kidnapping charges.  Dixon was sentenced to two consecutive thirty-two-year, six month sentences for the two especially aggravated kidnapping charges.  Jones was sentenced to two consecutive twenty-year sentences for the two especially aggravated kidnapping charges.  On appeal, the defendants raise a number of issues, both jointly and individually.  They argue that the trial court erred in denying the motions to sever, in its jury instructions, and in sentencing.  Additionally, all argue that the evidence was insufficient to sustain their convictions.  Jones and Mickens individually present several issues, including that the trial court erred in admitting into evidence an affidavit supposedly written by Jones, by allowing Jones's jail armband to be read to the jury, in allowing a State's witness to testify that Dixon flashed gang signs during her testimony, and in certain rulings regarding the State's closing argument. Smith argues that the trial court excused a juror without cause.  Following our review, we affirm the convictions and sentences as to each defendant.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Steven W. Pittman, for appellant Corey Mickens; Joseph S. Ozment, for appellant Christopher Smith; Jeffery S. Glatstein, for appellant Matthew Dixon; and Addie M. Burks, Memphis, Tennessee, for appellant Choncey Jones.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; William L. Gibbons, District Attorney General; and Terry Harris and Lorraine Craig, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## ISSUES PRESENTED

Each defendant raises several issues on appeal:

I. Whether the trial court's jury instructions were proper (Mickens, Smith, Jones, and Dixon);

II. Whether the trial court erred by excusing Juror No. 4 without cause (Smith);

III. Whether the trial court erred by allowing the introduction into evidence of an affidavit allegedly written by Jones;

IV. Whether the trial court erred by allowing Jones's jail armband to be read in the presence of the jury;

V. Whether the trial court erred by permitting testimony that Dixon flashed a gang sign at a witness during the trial;

VI. Whether the trial court erred by denying the defendants' motions to sever (Mickens, Smith, and Jones);

VII. Whether Mickens was unduly prejudiced during closing arguments by the court allowing the State to comment on stricken witness testimony during the State's closing argument and by forcing Mickens to use his visual aids individually instead of cumulatively during his closing argument;

VIII. Whether the evidence was sufficient to sustain the defendants' respective convictions (Mickens, Smith, Jones, and Dixon);

IX. Whether the defendants' sentences were proper (Mickens, Smith, and Jones); and

X.     Whether cumulative error exists to warrant a new trial (Mickens, Smith, Jones, and Dixon).

## FACTS

The facts and parties surrounding the murder of Marshall "Pokey" Shipp and the kidnapping of Ricky "Kuboo" Aldridge are many and well tangled due, in large part, to the infrastructure and vernacular of the Gangster Disciples, of which, as we have stated, the defendants and victims were members. The indictments charged fifteen defendants in the crimes committed against Marshall Shipp and Ricky Aldridge. In an earlier trial, prior to that which is the basis for the instant appeal, Matrin Becton and Antonio Sykes, were both convicted of first degree premeditated murder, especially aggravated robbery, and two counts of especially aggravated kidnapping, and sentenced to life imprisonment without parole for the murder and twenty-five years for each of the remaining charges with all sentences to be served consecutively, for an effective sentence of life without parole plus seventy-five years. See State v. Matrin Becton and Antonio Sykes, No. W1999-00581-CCA-R3-CD, 2002 WL 1349530 (Tenn. Crim. App. June 19, 2002), perm. to appeal denied (Tenn. Dec. 9, 2002).

## I. The Gangster Disciples

The Gangster Disciples are a large gang operating in and around Memphis and headquartered in Chicago. They are internally governed according to an established hierarchy.[1] There is a "board" in Chicago, led by the "king," Larry Hoover, who acts as the national supervisor, which appoints an "overseer" in other cities. In Memphis, the appointed overseer was Tony "T-Money" Phillips, who had authority over all Gangster Disciple activity in Memphis. To enforce gang rules, two "chiefs of security," Robert Walker and Johnny "Jay Rock" Jefferson, served under the overseer, with Walker as "chief of security, growth and development" and Jefferson as "chief of security, enforcer." However, the practical difference appeared semantic at best: Walker "made sure everybody abided by the rules" while Jefferson "had to enforce the rules." Each chief of security had two "assistant chiefs of security." Jefferson's assistant chiefs were brothers Larry and Matthew Boister, while Walker's were two of his cousins. Also under the overseer was an "auxiliary governor" whose duties included appointing the "governors" for the different Memphis regions and acting as a middle-man between the governors and the overseer. The governor of the South Memphis region, where these crimes occurred, was defendant Corey "Tombstone" Mickens. Each regional governor had an "assistant governor," and Mickens' assistant governor for South Memphis was his codefendant, Christopher Smith. Also under the auxiliary governor was a "floating regent" who had authority under any governor in any region in Memphis. Additionally, each governor had a "regent" whose authority was limited to a particular region, Matrin "McMarcus" Becton being the regent for South

---

[1]The majority of the information about the organization of the Gangster Disciples in general, and the Memphis Gangster Disciples in particular, is from the testimony of State witness Robert Walker, a former chief of security for the Memphis Gangster Disciples. He is currently incarcerated on two aggravated robbery charges and regularly provides information to local and federal authorities concerning the Gangster Disciples.

Memphis. The remaining Gangster Disciples were rear-echelon "outstanding members" with no authority, which was the membership level for the defendants, Matthew Dixon and Choncey Jones, as well as the victims, Marshall Shipp and Ricky Aldridge.

In addition to having their own hierarchy, the Gangster Disciples also had their own rules and methods of enforcing those rules, with violations including cooperating with law enforcement, insubordination, shooting at other Gangster Disciples, and disrespecting gang higher-ups. Punishments included fines, three-minute violations, six-minute violations, and death. Unlike fines and death, the other punishments require some explanation: three- and six-minute violations were three- and six-minute beatings administered by other members using their fists only, no weapons. A variant of the six-minute violation was the "pumpkin head deluxe," which involved putting the victim in a full nelson prior to his six-minute beating, presumably to allow the other members to beat his head to the size of a well-ripened pumpkin. Death punishments were to be administered using weapons in remote locations and were reserved for serious violations only. Death could be imposed by the overseer, while other punishments could only be imposed by members with the rank of governor or higher.

Walker told of the symbolic methods of executions utilized by the Gangster Disciples to kill their own members, describing one as "[s]even times to the front of the body, six times to the head, one time up the butt." Walker said the punishment reserved for him because he had violated "19/19," the code of silence, was "[c]utting off the penis."

## II. Shipp and Aldridge's Violations of the Gangster Disciple Rules

The L & B Lounge in South Memphis was the site of the two main events resulting in the murder of Marshall Shipp and the aggravated kidnapping of Ricky Aldridge. It was there, on August 29, 1997, that a birthday party was thrown for Gangster Disciple member Veronica Johnson. In attendance were Shipp and his girlfriend, Cheryl Patrick, a Gangster Disciple and close friend of Johnson. Also present was Devin Haywood, a mentally handicapped man whom some residents, including Shipp, had taken upon themselves to look after and protect around the neighborhood.

At some point that night, according to Johnson's testimony, defendants Dixon and Smith, along with fellow Gangster Disciples Matrin "McMarcus" Becton and "Karate Mike," had ordered Haywood, at gunpoint, to his knees where they proceeded to "beat him–hit him in the head with guns and stuff." Describing the beating administered to Haywood, Johnston testified, "His eye was like it was going to bust. You know, sitting outside his head." Witnessing the commotion, Shipp took action to stop the beating only to be ordered by Smith not to interfere with "G.D. business." Shipp persisted contrary to Smith's order. Because Smith was the assistant governor for South Memphis, Shipp's continued interference put him in direct violation of the Gangster Disciple rules prohibiting insubordination and disrespect toward gang superiors. Consequently, Smith told Shipp that "he had just signed his death certificate."

A second incident, also related to the offenses which are the subject of the present appeal, occurred at the L & B Lounge about two weeks later, on September 11, 1997. Veronica Johnson testified that an argument transpired between Shipp and another Gangster Disciple, DeCarlos Bean. Cheryl Patrick, also present, testified that the situation escalated when Bean and several others surrounded Shipp with pool sticks. Shipp's sister left the scene looking for Ricky Aldridge to help her brother. Aldridge and another cousin, "Scutt," got in the car with Shipp's sister and returned to the lounge. When Aldridge got to the lounge, he saw that Shipp was still surrounded and "jumped out of the car and shot up in the air three times" with a handgun which promptly dispersed the crowd. Shipp got in the car with Aldridge and, together with Shipp's sister and Scutt, they fled the scene. Because he "fired on" fellow gang members, Aldridge, like Shipp, was in violation of Gangster Disciple rules.

### III. Gangster Disciples' Punishment of Shipp and Aldridge: The Murder and Kidnapping

As Memphis chief of security, Walker met daily with overseer Phillips at Phillips' house to "talk to him about organization business." Walker testified about conversations that took place at these meetings. In late August of 1997, according to Walker, Mickens expressed growing concern to Phillips about a "rebellious" brother identified as "Pokey [Shipp]." Phillips told Mickens to "deal with it," "do whatever he wanted to do with it," and "to govern his own land." Around the same time, Ricky Aldridge attended a meeting at Mickens' house in which Mickens discussed the Shipp situation. According to Ricky Aldridge's testimony, Mickens said that "he ha[d] an incident on [his] cousin [Shipp] disrespecting the assistant governor [Smith] over there, and he was talking about he was being insubordinate to the assistant governor."

Walker testified that Mickens again expressed concern on September 15, 1997, to overseer Phillips about Shipp's rebellious behavior. Growing impatient with the situation, Phillips asked, "why he [Shipp] was still alive." Walker testified that a person, later determined to be Becton, telephoned for Phillips, who told Becton, "You all got him, go ahead and kill him, but hold up," at which point Phillips looked at Mickens who then left.

Although Mickens never directly asked for permission to kill Shipp, his purpose was apparent, according to Walker, because "you only come to him [Phillips] if you need to kill another member." Because Mickens was only a governor in the Gangster Disciple hierarchy, permission from the overseer to impose the death punishment was required, according to gang rules. Walker also testified that Ricky and Timothy Aldridge were discussed at the September 15 meeting. Apparently, "they was supposed to kill them too," but Mickens declined because "they weren't going to say anything."

These discussions came to fruition on the evening of September 15, 1997, as members of the Gangster Disciples took affirmative steps to implement the punishment of Shipp and Ricky Aldridge. Shortly before he was killed, Shipp confided in his cousin, Timothy Aldridge, that "they were going to place him under G.D. arrest" as a result of the August 29 conflict at the L & B Lounge with Smith. Later, Ricky Aldridge was informed that Mickens was looking for him and wanted to see him as

soon as possible. Ricky Aldridge walked to Mickens' apartment where Mickens said, "I got an incident that you was engaged in a shooting concerning a gangster on South Parkway. . . .[2] I can't believe you did that[.]" Aldridge denied the allegation and was then told by Becton, who was also present, that he would "be put in violation if [he] be found guilty[.]" After advising Ricky Aldridge that the matter was under investigation, he was told that they were "fixin' to get up with Pokey [Shipp]" and would "get back with [him] later on." After Ricky Aldridge unsuccessfully tried to contact Shipp about the developing situation, Aldridge took a seat on a friend's front porch and waited.

Shipp, meanwhile, was with Cheryl Patrick en route to the L & B Lounge when they were flagged down and informed that people were assembled at a nearby store and looking for Shipp. Shipp went to the store where he was confronted by Becton who said, "We want to talk to you about a little misunderstanding that's been going on." Shipp responded, "You can talk to me right here," and Becton replied, "We got to go somewhere else and talk." Defendant Jones was also present and ordered Shipp to "give [his] whore the car" and to "get [his] ass in [Jones's] car." Shipp refused, insisting he first take Patrick home. Becton intervened and a compromise was reached: Shipp could first take Patrick home in his car provided that Becton and defendant Dixon rode along and Jones followed in his car. Before and during the ride, Becton displayed his gun. Patrick was dropped off and the two cars drove away.

Ricky Aldridge was still sitting on the porch with his brother, when some Gangster Disciples informed him that Mickens was ready to speak with him again. The Aldridge brothers accompanied the Gangster Disciples to Mickens' apartment where, after being searched for weapons at the door, they entered and saw Shipp and approximately twenty Gangster Disciples, some of whom had automatic pistols. According to their testimony, both Aldridge brothers identified all four defendants as being present.

After much discussion concerning the proper punishment for Ricky Aldridge, Mickens, the highest ranking member present, decided that Smith and Becton should "handle the business the way [they] want to handle it." Mickens remained in his apartment as the crowd closely escorted the victims outside to their vehicles. At least two of the exiting Gangster Disciples, defendant Jones and Antonio Sykes, were obviously armed, and Jones said that Aldridge was "going with him."

Leaving in several vehicles, the Gangster Disciple caravan made its first stop at a gas station where Sykes took twenty dollars from Ricky Aldridge and jewelry from Shipp. Ricky Aldridge testified that he could not leave the car because he was "under G.D. arrest," and doing so would put him in further violation of gang rules.

The final destination, in South Memphis, was Desoto Park, a small and secluded park separated from the Mississippi River to the west by only a seldom used street and railroad tracks. The park contains "Indian mounds" which appear to be ordinary, small hills from the side but are

---

[2]The L & B Lounge is located at South Parkway and South Third Street.

actually concave bowls when viewed from above. The mound in question is approximately forty to fifty feet high and opens up to be eight feet deep with a large tree standing in the middle. Because of the mound's peculiar shape and beamed sides, activity inside it is virtually unnoticeable from the outside. This was the site chosen for the victims' punishments to be administered.

Upon arriving at the park, Shipp and Ricky Aldridge were corralled into the mound by Gangster Disciples, who were holding them by the backs of their pants. Although the crowd was composed of additional people, Ricky Aldridge specifically identified defendants Jones, Smith, and Dixon as being present. From the center of the mound, Shipp pleaded, "McMark, can I holler at you," to which Becton replied, "Ain't nothing else to talk about. You ain't shit no more. I'm fixin' to take your 'G.'" With this exchange, Jones entered the area with "some objects" he had taken from the trunk of his car, which Timothy Aldridge testified consisted of "[b]ats, jack irons, hammers, and a pistol." Ricky Aldridge testified that, at this point, "I thought we was fixin' to die."

The crowd surrounded Shipp first and "started to serve him his violation." Ricky Aldridge testified that as he waited for his punishment, five or six men, including Dixon and Smith, were beating Shipp with bats and a tire iron: "They was just beating him – just beating him. He was trying to fight back – then somebody hit him with the iron. He fell down. He was just on the ground. They just kept beating him – kept beating him." Smith then observed, "That bitch ain't dead yet," laughed, resumed beating Shipp, and directed the others to "[b]eat that bitch, beat that bitch." Ricky Aldridge said that he had seen Jones with a bat and, although he did not see Jones strike Shipp with the bat, Jones "hit [Shipp] with something."

Ricky Aldridge was next to be beaten. He testified:

> [T]hey started serving my violation. And I tried to cover up my face, and Choncey [Jones] grabbed me from the back and put me in a full nelson so I couldn't hide my face. And they were hitting me in my ribs and down in my – below my waist and in my face – just hitting me all over.

This beating was administered without weapons and lasted approximately six minutes. Ricky Aldridge testified that, as he was being beaten, he could hear the others still beating Shipp with weapons. Even after Ricky Aldridge's beating was finished, "they was still like beating [Shipp] with bats and jack irons and hammers – beating him between his privates. And they was just beating him."

Ricky Aldridge and the rest of the crowd left the mound as Becton, Sykes, and Shipp remained. Shipp was left, stripped from the waist down, by the tree in the mound. After he had left the mound, Aldridge heard one or two gunshots. According to Walker, while the two were incarcerated together, Becton told him that it was he who shot Shipp under orders from Mickens.

Smith told the Aldridge brothers to destroy Shipp's car. Instead, they left in the car and met up with Shipp's friend, Patrick Owens. Ricky Aldridge told Owens, "Man, they done killed him. They done killed him. He in the park." The two of them then returned to Desoto Park and found Shipp by the tree, mumbling incoherently and unable to walk, and assisted him to the car, driving him, still alive, to Cheryl Patrick's house. Johnson called 9-1-1 and then went outside to see Shipp in the car. According to Johnson, Shipp was naked from the waist down and so bloody and swollen that "he looked like a whole different person." An ambulance transported Shipp to the hospital where he died two days later on September 17.

Assistant Medical Examiner Dr. Thomas Deering testified at trial regarding Shipp's cause of death:

> It's my opinion that death was due to severe blunt trauma to the head with multiple skin lacerations; injury, swelling, and bleeding of the brain. And this was aggravated by a gunshot wound to the pelvis with bleeding – extensive bleeding internally – and also aggravated by blunt trauma to the lower legs.

Dr. Deering testified that either the brain injury or the gunshot wound alone would have been fatal, and the lacerations on Shipp's head were not the type caused by fists alone. Additionally, he testified that Shipp was shot in the buttocks. Such a shooting, Walker testified, is symbolic and not uncommon,[3] serving dual purposes: "[t]o send a message to the next gangster and let him know that, you know, if you decide to do the same thing, this is what's going to happen to you" and "[t]o let everybody know, you know, he a punk, he ain't no gangster. He ain't gonna be no gangster now, and he ain't gonna be no gangster up in the sky, either."

The only evidence presented on behalf of the defendants was the testimony of Delvin Lane, who was called by Mickens. Lane said that he had been a Gangster Disciple, but on May 14, 1999, he "got saved, and live[s] for the law." He said that on September 15, 1997, he had gone to Mickens' residence, where he saw Mickens at about 5:30 p.m. He was with Mickens until about 7:45 p.m. and saw him again that night at about 10:30 p.m., remaining with him until about 1:30 to 2:00 a.m., as they were trying to get Mickens' brother out of jail. As they were in the car together, apparently during the early morning of September 16, they saw Ricky Aldridge, who "looked real hysterical and scared." Aldridge told them that he needed his keys and money "from Antonio – from T-Murda." Lane said that he and Mickens agreed to give Aldridge a ride. On cross-examination, Lane agreed that he did not know where Mickens had been from 7:45 to 10:30 p.m. that night. Following this testimony, each defendant rested his case.

---

[3] See State v. Phillips, 76 S.W.3d 1 (Tenn. Crim. App.) (a Memphis Gangster Disciple execution where the victim was shot in the buttocks after being severely beaten), perm. to appeal denied (Tenn. 2001).

## ANALYSIS

## I. Jury Instructions

The defendants raise several issues relating to the trial court's jury instructions. Since some of the claims as to mistakes in the instructions are presented for the first time on appeal, one of our considerations will be whether all of these claims are properly before this court. In State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994), this court explained the considerations for determining whether a matter not objected to at trial may be presented as an issue on appeal:

> a) the record must clearly establish what occurred in the trial court;
>
> b) a clear and unequivocal rule of law must have been breached;
>
> c) a substantial right of the accused must have been adversely affected;
>
> d) the accused did not waive the issue for tactical reasons; and
>
> e) consideration of the error is necessary to do "substantial justice."

Id. (footnotes omitted).

We now will review the defendants' claims of error as to the instructions.

## A. Criminal Responsibility

Although none of the defendants asserted this argument in his motion for new trial, all argue on appeal that the trial court should have instructed the jury as to the natural and probable consequences rule of criminal responsibility. If so charged, the jury would have been required to determine whether Shipp's death was the natural and probable consequence of his kidnapping.

The trial court gave the following instruction as to criminal responsibility:

> When one enters into a scheme with another to commit a robbery and/or kidnapping and a killing ensues, all defendants may be held responsible for the death, regardless of who actually committed the murder and whether the killing was specifically contemplated by the other.
>
> As long as the defendant intended to commit the robbery and/or kidnapping and a killing resulted during the attempt to perpetrate the robbery and/or kidnapping, each defendant is responsible for the

-9-

murder, regardless of whether he intended for the victim to die or participated in the act of murder.

As to their convictions for first degree premeditated murder, Smith, Dixon, and Jones argue that the trial court's instruction as to criminal responsibility was defective because the jury was not required to determine whether Shipp's death was the natural and probable result of his kidnapping. We will review this claim.

In State v. Howard, 30 S.W.3d 271 (Tenn. 2000), the defendant was with a group of four masked men who robbed a restaurant, during which an employee was shot and killed. The relevant issue in Howard, for this appeal, was whether a robbery participant who did not fire the weapon killing the victim could be convicted of first degree murder. Our supreme court explained the showing necessary for a defendant so situated to be responsible for a killing during the robbery by another of the group:

> [T]o impose criminal liability based on the natural and probable consequences rule, the State must prove beyond a reasonable doubt and the jury must find the following: (1) the elements of the crime or crimes that accompanied the target crime; (2) that the defendant was criminally responsible pursuant to Tennessee Code Annotated section 39-11-402; and (3) that the other crimes that were committed were natural and probable consequences of the target crime.

Id. at 276.

In State v. Richmond, 90 S.W.3d 648 (Tenn. 2002), our supreme court ascertained that a trial court's failure to give a natural and probable consequences instruction was subject to a harmless error analysis. Citing Howard, 30 S.W.3d at 277 n.6, that constitutional error occurred when this instruction was warranted but not given, the court determined that such error could be harmless when the State had established beyond a reasonable doubt that "the error did not affect the outcome of the trial," and detailed the analysis to be used in ascertaining whether instructional error was harmless:

> [U]nlike Howard, where the evidence of the defendant's intent was sharply contested, the evidence here unquestionably established that defendant Richmond shared the intent of his fellow assailants and actively participated in every facet of the armed robbery and subsequent shootings. The assailants, including the defendant, approached the victims with at least three weapons, one being a fully automatic Uzi sub-machine gun. Shervon Johnson twice ordered his fellow robbers to kill the victims, and finally attempted to do so himself. Defendant Richmond stood, at most, a few feet from Mr. Johnson when he ordered his confederates to shoot the victims. He furthermore positioned himself so as to offer immediate assistance

should the need arise. Testimony established that defendant Richmond drove the getaway car in such a manner as to allow his co-assailant, Shervon Johnson, to fire indiscriminately in the direction of the club. Defendant Richmond then led police officers on a dangerous high speed chase through Knoxville housing projects. The defendant's role was such that the trial court properly charged, and the jury found him criminally responsible for the actions of his confederates. As such, we are convinced, and the jury so concluded, that defendant Richmond shared the same criminal intent as his confederates and clearly aided them in the completion of the target and collateral crimes.

Richmond, 90 S.W.3d at 658.

We first note, in our review, that the natural and probable consequences rule does not apply to every case in which the issue of criminal responsibility may be relevant. This court determined the rule did not apply when the crime of which the defendant was convicted was the target crime itself and not some unintended collateral crime. State v. Daniel Wade Wilson, No. E2000-01885-CCA-R3-CD, 2001 WL 872442, at *16 (Tenn. Crim. App. Aug. 2, 2001), perm. to appeal denied (Tenn. Mar. 11, 2002).

Previously, we have detailed the proof in this matter, including the hierarchy and punishment procedures of the Gangster Disciples, as well as the reasons and circumstances surrounding the kidnappings of the two victims. It is clear from the evidence that the intent was to kill Shipp and that he was first kidnapped so the intended crime could be accomplished in a remote location. Accordingly, the "target" crime was murder, not kidnapping. Thus, were we to determine that a natural and probable consequence instruction was necessary as to the first degree murder instructions, we would create the anomalous situation of requiring such an instruction simply because a lesser crime is committed to effectuate an intended homicide. Accordingly, we conclude that a natural and probable consequence instruction was not required as to the charge of first degree premeditated murder, the intent being to kill Shipp.

Mickens, who also argues that the trial court erred in not giving a natural and probable consequence instruction, was convicted of felony murder, which is defined as: "A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy." Tenn. Code Ann. § 39-13-202(a)(2) (1997). The approach of specifying that a felony murder charge may result only from the commission of certain enumerated felonies is explained in 2 Wayne R. LaFave & Austin W. Scott, Jr., Substantive Criminal Law § 7.5(b) (1986) (footnote omitted), as limiting "the felony-murder doctrine to those felonies which are 'inherently dangerous,' that is, the peril to human life must be determined from the elements of the felony in the abstract rather than from the facts of the particular case." LaFave further explains that, in a felony-murder prosecution, the issue "is not so much a matter of felony murder as a matter of parties to crime--the

problem of the responsibility of one criminal (A) for the conduct of a fellow-criminal (B) who, in the process of committing or attempting the agreed-upon crime, commits another crime." Id. at § 7.5(c) (footnotes omitted).

Likewise, LaFave explains the special status that felony murder occupies in the context of proving that the death of the victim was the "natural and probable consequence" of an underlying felony:

> Two striking exceptions to the general rules [of the "natural and probable" consequence rule of accomplice liability] discussed above are felony-murder and misdemeanor-manslaughter, for they do permit conviction for a homicide occurring in the execution of a felony or dangerous misdemeanor without any showing that the defendant intentionally, knowingly, recklessly, or even negligently caused the death.

Id. at § 6.8(b) (footnotes omitted).

Mickens was convicted of especially aggravated kidnapping and first degree murder in the perpetration of an aggravated kidnapping. Since kidnapping is one of the enumerated felonies upon which a felony murder charge can be based, we conclude that the trial court was not required to instruct the jury that it must determine whether the murder of the victim was the natural and probable consequence of his kidnapping. We note that the trial court instructed the jury that to find the defendant guilty of felony murder, it must find "that the killing was closely connected to the alleged kidnapping and/or robbery and was not a separate, distinct and independent event." The proof established that the "agreed-upon crime," utilizing the language from Substantive Criminal Law, was the murder of Shipp, with the victim first being kidnapped so he could be removed to a remote location. This being the situation, we conclude that a natural and probable consequence instruction was unnecessary.

## B. Reasonable Doubt

Mickens, Smith, and Jones contend that the trial court incorrectly instructed the jury on reasonable doubt, as to which the trial court utilized T.P.I.-Crim. 2.03(a):

> A reasonable doubt is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in this case.

> It is not necessary that the defendant's guilt be proved beyond all possible doubt, as absolute certainty of guilt is not demanded by the law to convict of any criminal charge.

A reasonable doubt is just that–a doubt that is reasonable after an examination of all the facts of this case.

If you find the state has not proven every element of the offense beyond a reasonable doubt, then you should find the defendant not guilty.

The claim as to incorrect reasonable doubt instruction was not raised in the motion for new trial by any of the defendants who now raise it on appeal. Thus, unless the trial court's reasonable doubt instruction constitutes "plain error," we cannot consider this claim on appeal. See Tenn. R. Crim. P. 52(b).

The defendant argues that the instruction was deficient because it does not include the phrase "moral certainty," as does T.P.I.-Crim. 2.03. The comment to the latter section explains why, at the time of the 1995 printing of the fourth edition of the Tennessee Pattern Jury Instructions,[4] there were alternative instructions as to "reasonable doubt":

> The Committee is of the opinion that the use of the term "moral certainty" in the jury charge on reasonable doubt may be reversible error under Cage v. Louisiana, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990). Therefore, the Committee has written an alternative instruction, T.P.I.–CRIM. 2.03(a), Reasonable Doubt. However, as of the time of publication of this edition, the Court of Criminal Appeals had approved the use of the term "moral certainty" in this instruction. State v. Hallock, 875 S.W.2d 285 (Tenn. Crim. App. 1993), appeal denied (Feb. 28, 1994).

T.P.I.-Crim. 2.03, Cmt. 2.

In State v. Ronald D. Correll, No. 03C01-9809-CC-00318, 1999 WL 812454, at *8 (Tenn. Crim. App. Oct. 8, 1999), perm. to appeal denied (Tenn. Apr. 24, 2000), this court reviewed the cases where T.P.I.-Crim. 2.03(a), utilized by the trial court in this matter, had been upheld:

> This court has held that T.P.I. Crim. No. 2.03(a) is consistent with principles of due process. State v. Saulsberry, No. 02C01-9710-CR-00406, 1998 WL 892281, at *13-14 (Tenn. Crim. App. at Jackson, December 21, 1998); State v. White, No. 02C01-9710-CR-00384, 1998 WL 376352, at *1 (Tenn. Crim. App. at Jackson), perm. to appeal denied, ( Tenn. 1998); State v. Henning,

---

[4]The fifth (current) edition of the Tennessee Pattern Jury Instructions does not include the alternative instructions discussed here.

No. 02C01-9703-CC-00126, 1997 WL 661455, at *9 (Tenn. Crim. App. at Jackson, October 24, 1997).

In State v. Melvin Edward Henning, No. 02C01-9703-CC-00126, 1997 WL 661455 (Tenn. Crim. App. Oct. 24, 1997), we rejected a challenge, like that of the defendants in the present appeal, that 2.03(a) was deficient because it did not contain the phrase "to a moral certainty":

> Tennessee Pattern Instruction 2.03(a) tracks virtually identical language of pattern reasonable doubt instructions approved by a majority of the federal circuits. See, e.g., United States v. Velasquez, 980 F.2d 1275, 1278 (9th Cir.1992), cert. denied, 508 U.S. 979, 113 S. Ct. 2979 (1993); United States v. Campbell, 874 F.2d 838, 841 (1st Cir. 1989); United States v. Hall, 854 F.2d 1036, 1039 (7th Cir. 1988); United States v. Kirby, 838 F.2d 189, 191-192 (6th Cir. 1988); United States v. Colon, 835 F.2d 27, 31-32 (2nd Cir. 1987), cert. denied, 485 U.S. 980, 108 S. Ct. 1279, 99 L. Ed. 2d 490 (1988); United States v. Dilg, 700 F.2d 620 (11th Cir. 1983); United States v. Alonzo, 681 F.2d 997, 1002 (5th Cir.), cert. denied, 459 U.S. 1021, 103 S. Ct. 386, 74 L. Ed. 2d 517 (1982); United States v. Robertson, 588 F.2d 575, 579 (8th Cir. 1978), cert. denied, 441 U.S. 945, 99 S. Ct. 2166, 60 L. Ed. 2d 1048 (1979). Moreover, the questioned language "based upon reason and common sense" and "absolute certainty is not required" has repeatedly been upheld as passing constitutional muster. See, e.g., United States v. Kime, 99 F.3d 870 (8th Cir. 1996), cert. denied, [519] U.S. [1141], 117 S. Ct. 1015 (1997); United States v. Miller, 84 F.3d 1244 (10th Cir.), cert. denied, [519] U.S. [985], 117 S. Ct. 443 (1996) overruled on other grounds by United States v. Holland, 116 F.3d 1353 (10th Cir. 1997); United States v. Campbell, 61 F.3d 976, 980-981 (1st Cir. 1995), cert. denied, [517] U.S. [1161], 116 S. Ct. 1556 (1996); Hall, 854 F.2d at 1038-1039; United States v. Rahm, 993 F.2d 1405, 1412 (9th Cir. 1993).
>
> We do not find that the instruction taken separately renders the reasonable doubt instruction constitutionally deficient. Additionally, considering this language in the context of the full charge, we find no reasonable likelihood that the jury understood the instruction to permit conviction after anything but a process of careful deliberation or upon less than proof beyond a reasonable doubt. This issue is without merit.

Id. at *9 (footnote omitted).

We conclude that the reasonable doubt instruction was adequate and, thus, applying the considerations set out in Adkisson, 899 S.W.2d at 641-42, determine that this issue cannot be raised on appeal, for the trial court did not err in its reasonable doubt instruction, much less commit plain error.

## C. Facilitation

Smith and Jones argue that the trial court erred by not instructing the jury on facilitation as to first degree murder and especially aggravated kidnapping. Neither presented this issue in his motion for new trial.

Tennessee Code Annotated section 39-11-403(a) defines facilitation:

> A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony.

Tenn. Code Ann. § 39-11-403(a) (1997).

Facilitation is a lesser-included offense of both first degree murder and especially aggravated kidnapping. State v. Burns, 6 S.W.3d 453, 470 (Tenn. 1999). However, that fact does not necessitate it should be charged to the jury. In Burns, our supreme court developed a two-step analysis for determining whether a lesser-included offense instruction should be given:

> First, the trial court must determine whether any evidence exists that reasonable minds could accept as to the lesser-included offense. In making this determination, the trial court must view the evidence liberally in the light most favorable to the existence of the lesser-included offense without making any judgments on the credibility of such evidence. Second, the trial court must determine if the evidence, viewed in this light, is legally sufficient to support a conviction for the lesser-included offense.

6 S.W.3d at 469.

At the trial of this matter, the parties discussed at length whether the facilitation instruction should be given. The trial court instructed as to facilitation in Indictment 98-02267, Count 2, as to Mickens for the felony of murder in the perpetration of a kidnapping, in Count 3 as to all four defendants for the felony of murder in the perpetration of a robbery; in Indictment 98-02268, Counts 1 and 2, as to Mickens for especially aggravated kidnapping; in Indictment 98-02269 as to all four defendants for facilitation of the felony of especially aggravated robbery; and in Indictment 98-02270

-15-

as to Mickens for facilitation of the felony of especially aggravated kidnapping. The trial court explained the basis for so instructing:

> And in this case, I think, as to each of the four defendants, there is – in my judgment, the proof clearly points – if the jury accredits the witnesses and their testimony that has been presented in this trial, it clearly points to the willing participation of each of these four defendants in these events. And there was no other evidence offered to indicate that these individuals were not involved.
>
> Choncey Jones was driving the car – his car.
>
> Matthew Dixon was in the back seat of the car and was grabbing one of the men by the seat of their pants dragging them up the hill.
>
> Christopher Smith was in lead with Matrin Becton in orchestrating things at the hill.
>
> Corey Mickens was, according to the proof, the man who went to Tony Phillips and got the approval for the murder.
>
> So all the proof indicates full participation – full knowing, willing, active participation, obviously in varying roles; but full, knowing, willing active participation in these events; not a situation where the participation was, in any way, accidental or unintentional. And so I think that this case is also factually and legally distinguishable from Lewis, and I don't think the facilitation is applicable, and I will not charge that. I didn't charge it in the first case. I'm not going to charge it in this case. I'll note your exception.

We agree with the trial court's characterization of the evidence. Smith told Shipp that he had "signed his death certificate." Smith participated as Shipp was beaten with bats, jack irons, and hammers and, remarking "that bitch ain't dead yet," encouraged the others to continue to "beat that bitch." It was Jones who ordered Shipp to "get his ass in [Jones's] car" on the night of the murder and supplied the weapons used to kill Shipp. Both defendants participated in taking the victim to a remote location at night in a manner consistent with the established Gangster Disciple procedure for the imposition of a death punishment. Even viewing the evidence liberally, we cannot find that reasonable minds could conclude that Smith and Jones only furnished "substantial assistance" for the kidnapping and murder of Marshall Shipp but without the intent that they occur.

## II. Excusing of Juror No. 4

Smith argues that the trial court erred by excusing a juror without cause. This matter arose when, during jury selection, one of the prosecutors advised the prospective jurors that the defendants and the victims were members of the Gangster Disciples. Prospective juror number 4 said that he had "some relatives in Chicago. A whole bunch of them, they're males, you know, they're disciples, you know." During a subsequent bench conference which included the prospective juror, he was asked if he could "be a fair and impartial juror in this case knowing that you have family members, in Chicago, that are members of the same gang?" Prospective juror number 4 then responded, "I don't know, you know. Say a cousin, maybe if they find out, you know, say they might like dislike me, you know, just 'cause they all down, you know." He said that he had talked generally with his cousins about gangs, and they had asked him to join the Gangster Disciples. When asked by defense counsel whether this involvement with the Gangster Disciples would affect his ability to be a fair and impartial juror, he gave varying answers, expressing his concern if gang members discovered that he had been on the jury and what they would then do, "You know, I guess if they know me, they might know my family, you know. There's ain't no telling what would happen." When then asked if he believed that "something could happen" if he sat on the jury, he responded, "Possibly. There ain't no telling, you know." At the conclusion of the hearing, the State asked that the prospective juror be excused for cause, with counsel for Jones concurring. Counsel for the other three defendants objected to his being dismissed. The trial court explained why dismissal was appropriate:

> I appreciate [the prospective juror's] very candid answers, first of all, and I think that he would try, very hard, to be a good juror. I don't think that's the question. I think, though, it would ask too much of him to have him remain on this jury. He expressed a concern for his family here in Memphis. He stated that he knows some gangster disciples here in Memphis; that they know his family, and that would be a concern for him.
>
> He states that he has family – cousins in Chicago that are members of the gangster disciples that have tried to get him to join, but he has resisted thus far. He talks to them at family reunions; they tell him about gang activities. I mean he's just far too involved – perhaps not directly, but indirectly – far too involved. The pressures are too great, and it's just an unrealistic expectation to ask him to sit on this particular case. We've got ninety-five other jurors ready and able to sit and serve. It's not a question of peremptories. I mean there's still sixty-four peremptories, I guess, that could be used. But I just think that a challenge for cause would be appropriate here, and I'm going to relieve him. He can serve on another case tomorrow – a case that doesn't involve gangster disciples.

After counsel for Smith argued that the fact the jurors were identified only by number would prevent the identity of this prospective juror from being discovered, the trial court responded:

> I'm glad you brought that up. That's a very good point. This is an anonymous jury, the record should reflect. And had he just indicated that he had some marginal knowledge of gangs or gangster disciples, I might agree with you. But in this case, in spite of the fact that this is an anonymous jury, and they're all identified by number, he said that he knows, personally, gangster disciples here in Memphis, Tennessee; and that they know him, personally. And he specifically said that if they know him, then they'll know his family, and that leads to his concern. The very thing that we were trying to safeguard against, by having an anonymous jury, fell though the cracks here because gangster disciples know him personally, and that's an even stronger argument for going ahead and excusing him in this case.

The standard for whether a juror was properly excused for cause is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" <u>Wainwright v. Witt</u>, 469 U.S. 412, 424, 105 S. Ct. 844, 852 (1985) (quoting <u>Adams v. Texas</u>, 448 U.S. 38, 45, 100 S. Ct. 2521, 2526 (1980)). "[T]his standard . . . does not require that a juror's bias be proved with 'unmistakable clarity.'" <u>Id.</u> Even if it is unclear from the record, "there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." <u>Id.</u>, 469 U.S. at 425-26, 105 S. Ct. at 852. "[T]his is why deference must be paid to the trial judge who sees and hears the juror." <u>Id.</u> Unless there has been clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review. <u>Lindsey v. State</u>, 189 Tenn. 355, 366-67, 225 S.W.2d 533, 538 (1949); <u>see</u> <u>State v. Forbes</u>, 918 S.W.2d 431, 451 (Tenn. Crim. App. 1995).

We conclude that the trial court's reasoning was sound in excusing this prospective juror and a proper exercise of discretion.

### III. Jones's Affidavit

The affidavit, which is the subject of this assignment by Jones, states as follows:

> Choncey D. Jones, being first duly sworn or affirmed, does say and depose the following:
>
> I, Choncey D. Jones was on the scene, at the store when Marshall "Pokey" Shipp and the girls pulled in. I, Choncey D. Jones, am the owner of the burnt-orange automobile in question. I was the driver of this car before, after and during the chain of events. Joseph

Brown had no knowledge of these events and he was not present at any time before, during or after these events.

Apparently, this affidavit had been discussed at a pretrial hearing, for when counsel for Jones objected at trial to its admission, the trial court stated:

Well, I assume [the State] intend[s] to introduce the affidavit, or else they wouldn't be calling [this witness]. But didn't I hear you on this already? I think my ruling was that these objections of yours go to the weight and not the admissibility. Proper cross-examination may well be to ask, you know, who drafted the affidavit, where it's typed, and things of that sort that you stated as your concerns – not as to the admissibility of the document, but if a signature appears on it, and this notary can provide an adequate explanation that satisfies me as to the foundation for it's [sic] admissibility, then your concerns, I think, would go to the weight and not the admissibility. The jury may give it more or less weight depending on how convinced they are of the proof.

As to this affidavit, Jones argued at trial that the affidavit was inadmissible because the State had not laid a foundation as to how the "document came to be" and the State had only a copy, not the original. Jones argues on appeal that the trial court erred in allowing the affidavit to come into evidence because the State did not sufficiently prove the chain of custody, no foundation was laid as to its authenticity, it was hearsay, and, as a declaration against penal interest, the criteria for its admission were not met. Since the argument presented to the trial court was that the State had not laid a proper foundation for admission of the affidavit, we will consider only that claim, the additional arguments being waived because they were not argued at trial. See Tenn. R. App. P. 36(a).

Jones contests the authenticity of the affidavit. Because the affidavit was sent by a third party, Jones argues that the chain of custody from him to the district attorney general was not established. Tennessee Rule of Evidence 901(a) states: "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to the court to support a finding by the trier of fact that the matter in question is what its proponent claims." See State v. Ferguson, 741 S.W.2d 125, 127 (Tenn. Crim. App. 1987) (stating that tangible evidence may be properly introduced either when identified by a witness or the chain of custody is established). Authentication can be properly established by the testimony of a witness with knowledge that the "matter is what it is claimed to be." See Tenn. R. Evid. 901(b)(1). At trial, the affidavit's notary testified that the affidavit was executed by Jones, explaining that the standard procedure for notarizing such a document was to use the booking number on the inmate's armband for verification. The booking number on the affidavit was that of Jones. Also, an assistant district attorney general testified that the affidavit was the same one he received in the mail. As the "arbiter of authentication issues," the trial judge's discretion will not be disturbed absent clear mistake. See Tenn. R. Evid.

901, Advisory Commission Cmts.; Ferguson, 741 S.W.2d at 127. We conclude that the trial court did not abuse its discretion in determining that the affidavit had been sufficiently authenticated.

Additionally, Jones argues that, because the affidavit was a photocopy, it was inadmissible. Duplicates, such as photocopies, are "admissible to the same extent as an original unless a genuine question is raised as to the authenticity of the original." See Tenn. R. Evid. 1001(4), 1003; Bolton v. State, 617 S.W.2d 909, 913 (Tenn. Crim. App. 1981) (stating that a photocopy is admissible as original absent fraud or danger of mistransmission). Aside from the chain of custody issue addressed above, Jones raises no "genuine question" as to the affidavit's authenticity.

Finally, Jones argues on appeal that the affidavit consists of inadmissible hearsay. Although this argument was not presented to the trial court and, thus, cannot be raised on appeal, we conclude that it is without merit. The gravamen of the defendant's hearsay argument is that the affidavit was inadmissible as a declaration against penal interest because the State did not make the showing required by Tennessee Rule of Evidence 803(b)(3). While the affidavit could be construed as a declaration against penal interest, it is the alleged statement of Jones and against his penal interest. Thus, Rule 803 and the holding of Smith v. State, 587 S.W.2d 659 (Tenn. 1979), cited by the defendant, are not applicable, for both deal with a third party confession, not that of the defendant on trial.

Finally, even if the introduction of the affidavit were error, it was harmless. Because the affidavit contained nothing damaging to the defendant that was not already supported by abundant other evidence, it did not affect the verdict. Tenn. R. Crim. P. 52(a).

## IV. Jones's Jail Armband

During the process whereby Jones's affidavit came into evidence, the trial court allowed his booking number to be read aloud in court from his armband to establish that the inmate number on the affidavit matched that on the armband. The record reflects that the trial judge applied the balancing test of Tennessee Rule of Evidence 403,[5] concluding that an actual reading of the armband booking number was probative of the affiant's identity and was not outweighed by any prejudicial effect. However, Jones argues that this was error because it allowed the jury to see that he was incarcerated. As we have stated, the booking number was read because the State was attempting to lay a foundation for an affidavit that the defendant had challenged. The proof had established that the crimes occurred in September 1997, and the jury already had learned from the testimony of the notary, to which no objection had been made, that Jones was incarcerated as of May 10, 1999, the

---

[5]Tennessee Rule of Evidence 403 provides that:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

day the affidavit was executed. Given this, we conclude that even if the trial court erred, as Jones argues, in allowing his armband booking number to be read aloud, the error was harmless.

### V. Dixon's In-Court Gang Sign

Dixon argues that the court erred by allowing Veronica Johnson and Sergeant Rick Hall to testify that Dixon flashed Johnson a gang sign while she was on the witness stand. Because of the nature of this claim, we will detail the manner in which it developed in the trial court.

As Veronica Johnson was testifying on direct examination, the State asked for a recess, ostensibly to assemble photographs to show to the witness, later advising the court out of the presence of the jury that when Johnson had testified, apparently in a previous trial, "there were people making threats to her – mouthing at her." The court responded, "No, I think she's nauseous and about to get sick," and directed the State's victim-witness coordinator to accompany her to the bathroom. The court then made the following statement:

> I want to put this on the record: About five or six months ago, we tried two of these fifteen defendants and had a problem during that trial, as the transcript, I assume, would bear out, during one or two of the witnesses. It might have been this very same witness with defendants and individuals in the audience doing things to try to intimidate or rattle the witnesses.
>
> When this witness took the stand today, Ms. Johnson, she was fine when she took the stand. She appeared fine. She walked in here fine; didn't appear to be the least be [sic] nauseous or sick or to have any problem at all. And then just in an instant, all of a sudden, became rattled and told Sergeant Hall that she was sick and needed a break.
>
> And Sergeant Hall felt as though he saw the defendant, Matthew Dixon, flash what appeared to be some sort of sign or signal, which could be interpreted to be a gang signal of some sort to the witness right at the time she began looking aside and announced that she was feeling ill.
>
> Now, I'm going to tell all four of these men that if any sort of communication, verbal or non-verbal, is expressed toward any witness, then the response will be swift and certain and an easy decision for me. And that will be, "You're out of the courtroom for the rest of the trial." I mean it's just that simple. I mean, I'm not going to worry about ten-day contempt or anything of that sort when you're facing life without parole. The response will simply be,

"You're out of the courtroom for the rest of the trial." So if you want to sit in the courtroom and participate in your trial, there had better not be anything that can be interpreted, in any way, as an attempt to intimidate or rattle any witness.

And you all know exactly what I'm talking about. And any suggestion or any signal or statement, by you all, will result in your immediate removal from the courtroom for the rest of the trial. It's just that simple. There's not going to be any agonizing or ringing [sic] of hands or worrying about it. You'll just be taken out of the courtroom, and you'll spend the rest of the trial in the lockup area behind the courtroom.

And as far as – I don't know – I've seen a lot of people kind of coming and going from the audience section, but if you all have friends here, it's a public courtroom, they're welcome to be here, but they had better not make any attempt to communicate with witnesses or intimidate witnesses or, in any way, try to rattle witnesses or affect their testimony. This matter is far too serious to have any witness' testimony affected by any outside influences.

We try these cases in front of a jury with testimony, and a jury makes a decision. But the system doesn't work if witnesses are tampered with. And I view this to be an extremely serious matter.

When Johnson returned, the trial court questioned her as to whether gang signs had been flashed to her as she was testifying, which she denied had occurred, but did not explain why she had become ill while testifying. The court then directed:

And I'm also going to do this: I'm going to ask – not that the people – everyone in here is well-versed in the types of signals or signs that are part of gang communication, but I want the deputies to watch closely, the defendants, and let me know if anything is communicated to any of the witnesses from any of the four defendants, in addition to the normal, common-sense glares and stares that can be communicated by individuals and have been on previous occasions and previous trials.

Following the lunch recess, the State advised the court that Veronica Johnson had told one of the courtroom deputies that she "had broken down on the stand" because "Matthew Dixon had flashed a sign at her," and had flashed another sign as she was leaving the courtroom. The trial court then stated:

All right. And let me state, for the record, so that there's no concern about any ex parte hearings, when we broke for lunch – a few minutes after we had broken for lunch, Sergeant Hall informed me, in chambers, that he had been informed, by the witness, of the things that [the assistant district attorney general] just recounted. And we'd already broken for lunch, but I wanted that information to be conveyed to [the assistant district attorney general] so that she could talk to this witness, over the lunch hour, so we could then address this matter when we all came back, and that was the extent of the communication between [the State], Sergeant Hall, and myself right after we broke for lunch.

Finding that Matthew Dixon had flashed a gang sign to intimidate the witness while she was testifying, the trial court advised him of the consequences of his actions:

Well, I'll say this: To remove a defendant from a courtroom in the midst of a trial, especially one as serious as this, would be an extraordinary step, certainly. But it is not an unprecedented step. And what we're doing down here this week is not a game. And it's not an effort to see how much we can get away with or who can do what to different witnesses or who can manipulate the system in different ways or who can intimidate witnesses in one way or another.

We're down here to conduct a trial and have twelve jurors listen to the proof and make a decision in a very, very serious matter. And I'm absolutely satisfied that a gang sign was communicated by Mr. Matthew Dixon to this witness in the midst of the trial. Sergeant Hall saw it; felt that he saw it when it happened. And the witness, Ms. Johnson, confirmed it after she was through testifying. And her demeanor and level of anxiety and nervousness on the stand changed just like that. I mean within five seconds, it had changed, and she was shaking and visibly upset. And that didn't happen because she choked on a sip of water or she looked up and saw the fluorescent lights above her. That happened because of some external event. And it coincided, in time, with what Sergeant Hall saw, and it's borne out by what she's now testified to under oath.

I'm absolutely convinced that it happened. And it happened for a reason. Communications of that sort aren't engaged in for no reason at all. It happened for a very specific purpose, and that was, I'm satisfied, to intimidate this witness. She testified that this last Saturday, she had this message conveyed to her by a friend that the individuals, not naming specific names, but that people were out to

kill her. And as I mentioned earlier, last time we tried two other of these fifteen defendants. Similar problems occurred during the trial, and I'm running out of patience. And I'll – I'll be more than happy to have Mr. Matthew Dixon – or any or all of these defendants to have a seat in the lockup, and they can be brought messages by their attorneys with regard to the progress of the trial. And I'm absolutely satisfied that the appellate courts will uphold this step. I don't have any question about it because we can't try cases with defendants being allowed to intimidate the witnesses. That's not how the system works. And we can't have witnesses come in here – witnesses who have observed – And whether these men are guilty of this murder or not is yet to be determined by this jury, but an undeniable fact is that these witnesses that have testified already, observed this victim after he had been savagely and brutally beaten. And we cannot have these witnesses come in here, having seen what they saw, then be intimidated by the defendants or relatives or friends into not testifying. Our entire system would break down if that were allowed to occur. The fabric of our entire society would crumble if that were allowed to occur.

It's also equally apparent to me that when she sat down on the stand, while apparently Mr. Dixon did not flash an additional hand sign to her, that the glare that was given sufficiently upset her again to cause her to again break down in the witness room outside of the courtroom.

(There was a pause in the proceedings.)

All right. Reluctantly. Very reluctantly, and only because this is a first-degree murder case, I am not yet going to expel Mr. Dixon from the courtroom, but I can state, absolutely, that if there is any further – And I said it this morning, and I'm not following through with it this time, but I will the next time. If there is any further suggestion, in any way, that any of these four men have attempted to intimidate any witness, then I will, without hesitation, expel them from the courtroom for the balance of the trial without a doubt.

The State then asked to be allowed to recall Veronica Johnson to testify about the flashing of the gang sign. After hearing extended objections from defense counsel as to recalling the witness, the court explained why Johnson could be recalled by the State:

Okay. I'll tell you what I think makes this extremely relevant, and that is the fact that during voir dire, many hours were spent, or a

lot of time was spent – I don't want to overstate it, but a lot of time was spent discussing, with the jurors, the issue of credibility of witnesses – how do you examine a witness' credibility? How do you determine a witness' credibility? What types of things do you look for? Demeanor on the stand, how they appear, body language, whether they look you in the eye and that sort of thing. And this witness, when she first took the stand, was calm and competent and looked people in the eye and spoke directly and clearly. But as soon as this incident happened, she immediately got nervous, and she swung around in her chair, and she was looking over here at the rail there. And if you want to talk about credibility of witnesses in voir dire, and if you want to talk about credibility of witnesses in opening statement, and I'm sure you'll talk about credibility of witnesses in final argument, then in fairness to everybody, and especially in fairness to Ms. Veronica Johnson, the jury should be entitled to know why her demeanor, from this witness stand, took 180 degree about face midway through her direct testimony.

If we're down here about being fair, and fairly presenting, to the jury, the facts about this case, then they should be entitled to know why her demeanor changed so drastically so quickly. Even when we had that bench conference up here, and we questioned her from the witness chair after we had that recess, [defense counsel for Smith] and maybe one or two others noticed how visibly shaken she was. How upset and nervous she was at that time. And I think it would be patently unfair to the system and to Ms. Veronica Johnson not to allow an explanation to be offered as to why this happened. And that's why it's relevant – the credibility of each and every one of these witnesses is put before this jury and will be argued thoroughly by defense counsel, and the state, as it should be, in final argument. Those are things the jury should consider. Those are things that were covered thoroughly in voir dire.

And this very body language that you all talked about in voir dire is what the jury sat and watched. And so I think it's highly relevant to her testimony – to the credibility of her, as a witness, as it relates to every one of these defendants, but more specifically to the two defendants that she identified, by name, in that first incident, when that young man was being beaten on the 29th of August. Her testimony related to both of those individuals.

Now, true enough, the individual who flashed the gang sign was only one of the two. But Ms. Johnson, as a witness – her testimony

as a witness – the credibility of her testimony is going to be weighed. And her testimony applies to the case as a whole – the broader picture – the entire case, and certainly two defendants.

I'll be glad to offer a curative instruction so that the jury knows that, according to her testimony, this sign was flashed by only one of the four defendants; and beyond that, the other three defense lawyers will certainly have an opportunity, and it may well work to their benefit. I mean, usually when there's several defendants on trial, and as it's already developing in this case, as efforts are made to single out Mr. Becton, through opening statement and cross-examination, efforts are made to distance one defendant from another. And that's fine. That's certainly the job that you all are doing.

But this may well even enure [sic] to the benefit of the three co-defendants by saying, "Look, our clients are sitting back there as they should. We didn't have anything to do with this." So in that sense, it's hard to say that it will hurt the other three defendants if a curative instruction is given, and then the opportunities are present for defense counsel to further argue their case in final argument. And certainly, on cross examination, you can reiterate, through the witness, that it wasn't your client that did this. But no, I think it's relevant. And now, the question – and I'm going to allow her to testify. The question is the extent of the testimony, and the flashing of the sign is what I think is the relevant event. The look that was given afterwards is vague, even though she interpreted it to be a menacing, threatening look, that's something that's hard to really pinpoint. And the look wouldn't have affected her testimony, since it occurred after her testimony had been completed. So, it doesn't bear the same relevance to her demeanor and credibility as the sign would have.

And the Saturday conversation is really not admissible because it's hard to say who made those threats that were conveyed to her, and it's impossible to attribute those threats to any of these people. But what is, I think, permissible, is testimony regarding the gang sign that was flashed, in the middle of her direct examination, and the immediate effect that had on her and the fear that she had once she saw that.

Additionally, following the testimony of Sergeant Hall, the trial court instructed that the testimony of Dixon's flashing a gang sign was evidence only as to him:

-26-

Ladies and gentlemen of the jury, let me explain a couple of things to you. The testimony of these last two witnesses, Ms. Johnson, when she came back after lunch and testified, and the testimony of Sergeant Hall, is to be considered only as to it relates to the case of State of Tennessee v. Matthew Dixon.

And then I'll further explain to you that because Sergeant Hall has been called as a witness now in the case, I feel that it would probably be appropriate for him not to continue with his direct supervision of you all as the jury in this case. And so he'll be working the courtroom but won't be in direct contact with you jurors. And just so you'll know that that's the reason for his not being in contact with you, I wanted to offer that explanation to you as well. All right. Call your next witness.

Dixon does not contest the relevance of the testimony, arguing instead that the testimony was unfairly prejudicial and should not have been allowed under Tennessee Rule of Evidence 403. However, "[t]he fact that relevant evidence is prejudicial does not mean the evidence must be automatically excluded." State v. Williamson, 919 S.W.2d 69, 78 (Tenn. Crim. App. 1995). Johnson's initial testimony had been of the events leading up to Shipp's murder, including Smith's telling Shipp that "he had just signed his death certificate." Clearly, much of Johnson's testimony was crucial to the elements of premeditation and intent. We have previously set out the trial court's recounting of the "180 degree about face" in Veronica Johnson's demeanor, as she was testifying, and after Dixon had flashed the Gangster Disciple sign. In assessing her credibility, the jury was entitled to know the reason for this. "The question of whether evidence is admissible rests within the sound discretion of the trial court; and this Court will not interfere with the exercise of this discretion unless clear abuse appears on the face of the record." State v. Hill, 885 S.W.2d 357, 361 (Tenn. Crim. App. 1994). Here, the trial court expressed sound reasons why the testimony was relevant; and, we conclude that there was no abuse of discretion in this finding.

In a related matter, Jones argues that the trial court erred by refusing to allow other courtroom officers to be questioned as to whether they saw Dixon flash a gang sign. There are two problems with this claim. First, at trial, only Smith's counsel asked that the other courtroom deputies be permitted to testify as to whether they had seen Dixon flash a gang sign during Johnson's testimony. Thus, by this assignment, Jones is arguing that the trial court erred in overruling a request of Smith's counsel. Further, there is no showing as to what the testimony of the other courtroom deputies would have been. Accordingly, we conclude both that Jones cannot raise this issue on appeal, not having presented it to the trial court, see Tenn. R. App. P. 36(a), and even if this were not the case, the claim of error is speculative, there being no proof of what the testimony of the other deputies would have been.

## VI. Severance

Mickens argues on appeal that the trial court should have granted him a pretrial severance, and he, Smith, and Jones argue that the trial court erred in not severing the cases during the trial. While the record on appeal contains these defendants' pretrial motions to sever, it includes an order denying only Mickens' motion. Additionally, it does not include a transcript of any hearing on the motions, although a minute entry dated February 4, 1999, recites that Mickens' motion to sever "having been fully heard and fully considered" was denied. Other than this, the record does not reveal what occurred prior to the trial with regard to the motions to sever.

According to Tennessee Rule of Criminal Procedure 14, the trial court must grant a severance pretrial if necessary to ensure a fair trial.[6] The "clear prejudice" test applies to this determination. His argument for pretrial severance is that, because he was not physically present during the actual murder and kidnapping and his acts were "drastically different" than those of his codefendants, he should have been tried separately. However, "[d]isparity in the evidence against the defendants is not alone sufficient to warrant the grant of a severance." State v. Howell, 34 S.W.3d 484, 491 (Tenn. Crim. App. 2000). The arguments set out by Mickens do not establish why a joint trial prevented a fair determination being made as to his guilt or innocence. We conclude that this assignment is without merit.

The practice of trying codefendants in a single trial is "aimed at achieving improved judicial economy and efficiency." See Tenn. R. Crim. P. 8, Committee Cmts. According to Tennessee Rule of Criminal Procedure 14(c)(2)(ii), a trial court must sever the defendants during a trial if "necessary to achieve a fair determination of the guilt or innocence of one or more defendants."[7] The decision to sever criminal defendants is wholly within the discretion of the trial court, State v. Maddox, 957 S.W.2d 547, 556 (Tenn. Crim. App. 1997), and cannot be interfered with absent "clear abuse." Howell, 34 S.W.3d at 491. This court has held, "[w]here a motion for severance has been denied, the test to be applied in determining whether the trial court abused its discretion is whether the defendant was 'clearly prejudiced' in his defense as a result of being tried with his codefendant[s]."

---

[6] Rule 14(c) states, in pertinent part:

(2) The court, on motion of the State or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:

(i) before trial, it is deemed necessary to protect a defendant's right to a speedy trial or it is deemed appropriate to promote a fair determination of the guilt or innocence of one or more defendants.

[7] Rule 14(c)(2)(ii) states:

(2) The court, on motion of the State or on motion of the defendant other than under subdivision (c)(1), shall grant a severance of defendants if:

(ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

-28-

State v. Price, 46 S.W.3d 785, 803 (Tenn. Crim. App. 2000), perm. to appeal denied (Tenn. 2001). Therefore, we must ascertain whether the defendants were clearly prejudiced by the trial court's decision not to sever their trials.

To establish the requisite prejudice, the defendants cite two incidents: the flashing of a gang sign by Dixon and the subsequent testimony about it from Veronica Johnson and Sergeant Rick Hall. Additionally, they argue that they were prejudiced by the cross-examination of Officer Charles Cathey by Dixon's attorney because the questions opened the door for evidence concerning a crowbar used in the murder.

The defendants premise their first argument, that they were prejudiced by Dixon's flashing a gang sign during the testimony of and to intimidate a State's witness, on the holding in State v. Carruthers, 35 S.W.3d 516 (Tenn. 2000), cert. denied, 533 U.S. 953, 121 S. Ct. 2600, 150 L. Ed. 2d 757 (2001), where our supreme court determined that the trial should have been severed because Carruthers' trial conduct and incompetent *pro se* representation prejudiced his codefendant. However, Dixon's single act pales in comparison to those of Carruthers, which the court detailed:

> [D]espite the trial court's efforts, the record demonstrates that Montgomery was severely prejudiced by Carruthers' self-representation, specifically, his offensive mannerisms before the jury ["scratching or pulling around his groin when standing facing the jury"], his questioning of witnesses that elicited incriminating evidence, and most importantly, his calling Alfredo Shaw to testify as a witness. The prejudice to Montgomery was compounded when the State used and emphasized the incriminating evidence elicited by Carruthers during its closing argument.

Id. at 553-54 (citations omitted). Clearly, Dixon's isolated act does not approach the continuing egregious behavior of Carruthers. The defendants argue that Dixon's flashing of a gang sign was "a real life, in court demonstration of the fear a gang member can impose upon a witness. The adage a picture, or in this case [a] demonstration, is worth a thousand words comes to mind." That may be true, but the impact of Dixon's conduct is anemic when compared to the gruesome Gangster Disciple sanctioned punishment inflicted upon Marshall Shipp, the details of which the jury was aware through testimony and photographs. Thus, we respectfully disagree that, given the nature of this case, Dixon's flashing a gang sign had the impact which the defendants assert. The testimony and instructions of the trial court made it clear that Dixon had flashed the gang sign and that it was to be considered only as to him.

Additionally, Mickens and Smith argue that Officer Cathey's testimony, regarding Jones's telling him that the murder weapons were in the trunk of his car, was prejudicial, thus necessitating that the trial court grant a severance during the trial. This matter arose during the State's proof, after Officer Cathey had testified on direct examination of two crowbars which had been removed from

the trunk of Jones's vehicle and shown to the jury. Counsel for Dixon then asked a series of questions about the crowbars, including the following:

> Q     Officer, based on that testimony that was just elicited – I mean you're not here to testify, and you're not testifying – as far as you know, these crowbars are, in no way, related to this incident?
>
> A     (No audible response.)
>
> Q     Are you prepared to testify that you know that these crowbars are part or were used in the beating of Marshall Shipp?
>
> A     I can't say those are, but it was stated to me that crowbars were used.
>
> Q     I'm talking about these crowbars.
>
> A     No, sir, I can't say that.

The State then advised the court that while they had not intended for Officer Cathey to testify whether the crowbars in the trunk had been used to beat Marshall Shipp, the door had been opened by defense counsel's cross-examination. The trial court then explained the problem resulting if the jury were not allowed to hear whether Officer Cathey agreed with Dixon's claim that he had no knowledge of whether the crowbars had been used in the beating of Shipp:

> You know, that puts things in a little bit different light. And he, in fact, does have some knowledge. I mean, he said no because he's been told not to get into the statements during the testimony; but if, in fact, he does have knowledge, that "Well, one of these defendants did actually tell me the crowbars that were used are in the trunk, and the hammer is in the trunk in a purple bag, or whatever. The bats, I don't know where they went to," then that casts a little bit different light on those crowbars because I know, certainly, as good defense lawyers, when final argument comes, you all would be arguing – if this witness is not allowed to respond to what we know the truth is, and that is that Choncey Jones did say, "Yeah, the crowbars that were used are in the trunk of the car." If he's not allowed to respond to that, then in final argument, "What good are these crowbars? They've got nothing to do with this case. It was negative for fingerprints. It was negative for blood. Every car in this city has got a crowbar in it. What's the big deal about finding a crowbar in the car?"

-30-

And that would be a fine argument to make except for the fact that we know – the jury doesn't know yet, but we know that actually Choncey Jones said, "Yeah, the crowbars that were used are in the trunk. I don't know where the bats went to." You know, so that's the dilemma right now.

The trial court concluded that admission of Jones's statement as to the crowbars in his trunk would not appear to affect Mickens, whose position was that he had not been present at the scene. Jones's counsel argued that the testimony would be "prejudicial" to his client and asked that a severance be granted as to Jones. The State responded that the relating of Jones's statement would affect only him:

This statement does not make reference to a co-defendant, which is what Bruton would require that it would be deleted. It does not. It says – it doesn't say, "The weapons we used." It doesn't say, "The weapons me and Christopher Smith used," or me and anybody else. It just says, "The weapons used," and he told them they were in the car. This would have been admissible on the front end, I think, regardless of [defense counsel for Dixon's] questioning. And I would ask that it be admitted. And of course he's free to cross-examine, and he's free to argue. There's still no connection between those and his client other than the connection to Jones.

The trial court then ruled that Officer Cathey could explain his knowledge as to whether the crowbars had been used in Shipp's beating:

All right. Let me say this: Everyone is entitled to a fair trial but not a perfect trial. That's often been said, and we do the best we can. And I think that [defense counsel for Jones's] argument is not well founded because if a severance were granted for her client, then this statement could come in, on the front end, without any concern about opening doors to let it in against her client. So I still – Even though I understand what she's saying, I still don't think that it's a meritorious argument.

The jury knows or soon will know that crowbars were used in the beating of Marshall Shipp. And the jury has heard that a couple of crowbars were taken out of the trunk of the car of Choncey Jones; and the jury knows, or soon will know, that Choncey Jones' car was one of the cars that drove from the beginning point that night out to the Indian mound where Marshall Shipp was beaten.

And then the implication was left that while an officer did retrieve these two crowbars from the trunk, he had no personal knowledge or information, whatsoever, that these were the crowbars that were used in this beating when, in fact, he was told by one of these four men, in this courtroom, that these were, in fact, the crowbars that were used in this beating.

I don't think there's a Bruton problem, and I think it's a type of statement that, in all honesty, even with four defendants, could have come in, in the state's case-in-chief. I'm not sure that a door had to be opened in order for this to come in. But certainly now, with the questions that have been posed on cross examination, I think the question – I mean the response, in one form or another, should come in. I'll note your exceptions. I understand [defense counsel for Smith's] argument. But again, there's nothing that directly ties his client to Mr. Jones' statement. There's no Brutton [sic] problem. He can still make the argument – I mean the fact that crowbars were used will be a matter of record when this proof is over if this proof is the same as it was in the first trial.

Officer Cathey then was recalled and testified:

Q   Officer Cathey, you were asked a question concerning whether or not you had any knowledge of a connection between these crowbars that you removed from the trunk and the defendants. Is that right?

A   Yes, sir.

Q   And I believe you indicated that you were told that those were involved. Is that right?

A   Yes, sir.

. . . .

Q   Now, on that date of September 28th of 1997, did you and Sergeant Ballard have occasion to question Choncey Jones?

A   Yes, sir.

Q   Okay. And did you ask him where the weapons were?

A    Yes, sir.

Q    And did he tell you that the hammer and crowbar were in the trunk of the car?

A    Yes, sir.

Q    Of his car?

A    Yes, sir.

Q    Okay.  And did he say anything about the bats?

A    He said the bats and the clawhammer were in the trunk of the car also in a maroon bag.

Q    Now, if you had the opportunity to – this particular oral statement that was read – I mean that Mr. Jones gave you, did you record that? – was that recorded in the supplement?

A    Yes, sir.

Q    Okay.  And if you had the opportunity to review that supplement – would that refresh your memory as to the exact words that were said?

A    Yes, sir.

. . . .

Q    If you would read that paragraph to yourself?  All right. Sergeant – I mean Officer Cathey, what items did he state to you were in the trunk of the car?

A    The crowbar.

Q    Okay.  And did he also mention a hammer?

A    A hammer, yes, sir.

Q    Okay. And what did he say in regards to the bat?

A    He did not know where they was [sic] at.

Q    He did what?

A    He did not know where the bats were at.

Q    Now, did you, in fact – after being told that by Choncey Jones, did you then go to retrieve those items from the trunk?

A    Yes, sir.

Q    Okay.  And did you find the two crowbars that you have previously identified and that have been moved into evidence in this case?

A    Yes, sir.

Q    And did you find any hammer?

A    No, sir.

Q    And did you find a bat?

A    No, sir.

Q    Or bats?

A    No, sir.

We respectfully disagree either that the trial court erred in allowing this testimony, or that it prejudiced Mickens or Smith.  In fact, as the trial court observed, neither of them was implicated by it.  Further, in view of the abundant evidence against Mickens and Smith, any error in allowing this testimony would have been harmless.  Accordingly, we conclude that the trial court did not err in refusing to sever the prosecutions.

## VII.  Closing Arguments

Mickens raises two issues related to closing arguments:  the State improperly referred to witness testimony that had been stricken, and the trial court erred by forcing him to display his visual aids individually, as opposed to cumulatively.  However, in the record, the closing arguments are only "noted, not transcribed."

Tennessee Rule of Appellate Procedure 24 provides that it is the appellant's obligation to provide a fair and complete statement of the relevant proceedings.[8] "Where the record is incomplete and does not contain a transcript of the proceedings relevant to an issue presented for review, or portions of the record upon which the party relies, an appellate court is precluded from considering the issue." State v. Ballard, 855 S.W.2d 557, 560-61 (Tenn. 1993). Because no record of the closing arguments was provided, these arguments are waived.

## VIII. Sufficiency of the Evidence

Each defendant contends that the evidence is insufficient to support his respective convictions. Smith, Dixon, and Jones argue that the evidence does not support their convictions for first degree premeditated murder; Mickens challenges his felony murder conviction by arguing that the evidence does not support the underlying conviction for the especially aggravated kidnapping of Shipp, with the other three defendants also arguing that the evidence does not support their convictions for especially aggravated kidnapping.

In considering the issue as it relates to each defendant, we apply the familiar rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992); Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and

---

[8]Tennessee Rule of Appellate Procedure 24(c) states:

> If no stenographic report, substantially verbatim recital or transcript of the evidence or proceedings is available, the appellant shall prepare a statement of the evidence or proceedings from the best available means, including the appellant's recollection. The statement should convey a fair, accurate and complete account of what transpired with respect to those issues that are the bases of appeal. The statement, certified by the appellant or the appellant's counsel as an accurate account of the proceedings, shall be filed with the clerk of the trial court within 90 days after filing the notice of appeal.

> jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

We now will consider the evidence as it relates to the insufficiency claims of each defendant.

### A. Sufficiency of the Evidence for First Degree Premeditated Murder

Defendants Smith, Jones, and Dixon assert that the evidence is insufficient to support their convictions for first degree premeditated murder. This offense is defined as:

> (1) A premeditated and intentional killing of another;
>
> (d) As used in subdivision (a)(1) "premeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Tenn. Code Ann. § 39-13-202(a)(1), (d) (1997).

A killing is intentional if committed by "a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (1997).

The presence of premeditation is a question of fact for the jury to determine based upon a consideration of all the evidence. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn.), cert. denied, 531 U.S. 967, 121 S. Ct. 401, 148 L. Ed. 2d 310 (2000). Premeditation may be inferred from circumstantial evidence surrounding the crime, including the manner and circumstances of the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); State v. Addison, 973 S.W.2d 260, 265 (Tenn. Crim. App. 1997). The circumstantial evidence of premeditation must, however, be "so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant,

and that beyond a reasonable doubt." State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971). Several factors tend to evidence premeditation: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing." State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

Here, proof of premeditation was abundant. Deadly weapons were used,[9] witnesses testifying that Smith and Dixon were part of the crowd beating the unarmed Shipp with bats, jack irons, crowbars, and hammers. The manner in which he was slain was, without a doubt, particularly cruel. His entire body was bludgeoned and he was shot in the pelvis, either of which was sufficient to cause death. Declarations were made of their intent to kill, Smith telling Shipp earlier that he had "signed his death certificate" and, during the murder, encouraging the others to "beat that bitch." Jones procured weapons from the trunk of his car. Preparing to conceal the crime, the defendants chose a location that insulated the sounds and sights within from those outside. Smith ordered the Aldridge brothers to destroy Shipp's car.

Jones makes the additional argument that the evidence was insufficient because there was no testimony that he actually hit Shipp. However, under a theory of criminal responsibility, the jury could have found him guilty of first degree murder.[10] A person criminally responsible for the conduct of another may be charged with the commission of the offense. See Tenn. Code Ann. § 39-11-401(b) (1997). This theory of guilt is based on the common law provision of criminal liability for principals, accessories before the fact, and aiders and abettors. See id. § 39-11-401, Sentencing Commission Cmts. The Code provides that "any person may be charged as a party if he or she is criminally responsible for the perpetration of the offense." Id. A person is criminally responsible for the conduct of another if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" Id. § 39-11-402(2).[11] This language is intended to

---

[9] Tennessee Code Annotated section 39-11-106(a)(5) defines a deadly weapon as:
> (A) A firearm or anything manifestly designed, made or adapted for the purpose of inflicting death or serious bodily injury; or
> (B) Anything that in the manner of its use or intended use is capable of causing death or serious bodily injury.

[10] Because the State's closing arguments were not transcribed, it is unknown whether the State employed this theory arguing Jones's guilt.

[11] The language of this section actually sets forth three ways in which a person may be found criminally responsible for an offense committed by the conduct of another:
> **Criminal responsibility for conduct of another.**—A person is criminally responsible for an offense committed by the conduct of another if:
> (1) Acting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense;
> (2) Acting with intent to promote or assist the commission of the offense,

(continued...)

-37-

include the conduct of defendants formerly known as accessories before the fact and aiders and abettors. See id. § 39-11-402, Sentencing Commission Cmts.

Criminal responsibility is not a separate crime but "solely a theory by which the State may prove the defendant's guilt of the alleged offense, . . ., based upon the conduct of another person." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). The legislative intent in promulgating the theory of criminal responsibility is to "embrace the common law principles governing aiders and abettors and accessories before the fact." State v. Carson, 950 S.W.2d 951, 955 (Tenn. 1997).

This court has noted that, under the theory of criminal responsibility, presence and companionship with the perpetrator of a felony before and after the commission of the crime are circumstances from which an individual's participation may be inferred. See State v. Ball, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). No particular act need be shown, and the defendant need not have taken a physical part in the crime. See id. Mere encouragement of the principal will suffice. See State v. McBee, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). To be criminally responsible for the acts of another, the defendant must "'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" State v. Maxey, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting Hembree v. State, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)). The defendant must "knowingly, voluntarily and with common intent unite with the principal offenders in the commission of the crime." State v. Foster, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988).

For conviction, the State need only have shown that Jones intended to assist in Shipp's murder. It was Jones who told Shipp to "get [his] ass in [Jones's] car" when Shipp was abducted and Jones who, witnesses testified, retrieved the murder weapons from his trunk, which Jones later admitted. Thus, it is clear from the record that Jones intended to assist in the commission of this crime, and did so.

In State v. Phillips, 76 S.W.3d 1, 10 n.5 (Tenn. Crim. App.), perm. to appeal denied (Tenn. 2001), this court noted with approval the holding of the Illinois Court of Appeals, also in a Gangster Disciple beating death case, finding the evidence was sufficient to sustain a conviction for first degree murder:

> In People v. Mullen, 730 N.E.2d 545, 552 (Ill. App. Ct. 2000), appeal denied, 738 N.E.2d 933 (Ill. 2000), the court affirmed the

---

[11] (...continued)
> or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or
>    (3) Having a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.

Tenn. Code Ann. § 39-11-402 (1997).

conviction of the defendant for first degree murder on a theory of criminal accountability. The defendant was with a group of ten to fifteen members of the Gangster Disciples in Chicago who chased the victim down a street, pulled him from his truck, and beat him to death. The defendant, who was positively identified by bystanders as being one of the group, claimed that he was just present during the beating. Id. at 551. The Illinois Appellate Court, in affirming the conviction, stated the following:

> Here, defendant chased the victim, stayed during the beating, and stood over the victim as codefendant Townsend kicked the victim while another man hit the victim with a bat. Defendant did not offer to help, he did not discourage or disapprove of the crime, he came and left with the group that actively participated in the beating and he did not report the crime. Thus, although Norfleet [eyewitness] did not see Mullen hitting or kicking the victim, a rational trier of fact could find that defendant was accountable because he was not merely present during the beating. Id. at 552.

We conclude, likewise, that the evidence is sufficient to sustain the convictions of Smith, Dixon, and Jones for the first degree premeditated murder of Marshall Shipp.

### B. Sufficiency of the Evidence for Mickens' Conviction for First Degree Murder in the Perpetration of Kidnapping

Mickens was convicted of first degree murder in the perpetration of kidnapping as defined in Tennessee Code Annotated section 39-13-202. That statute reads in part:

> (a) First degree murder is:
>
> (2) A killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy.

Tenn. Code Ann. § 39-13-202(a)(2) (1997). Kidnapping occurs when one "knowingly removes or confines another unlawfully so as to interfere substantially with the other's liberty . . . [u]nder circumstances exposing the other person to substantial risk of bodily injury." Id. §§ 39-13-302(a), -303(a)(1) (1997). A kidnapping becomes especially aggravated when "[a]ccomplished with a deadly weapon" or "the victim suffers serious bodily injury." Id. § 39-13-305(a)(1), (4) (1997). The

challenge Mickens makes to his felony murder conviction is to contest the sufficiency of the evidence for the underlying felony conviction for especially aggravated kidnapping.

Mickens argues that the evidence is insufficient to support his especially aggravated kidnapping convictions because, relative to the other defendants, his participation in the punishments was limited. Because of the nature of his role, Mickens contends that he is not criminally responsible for the especially aggravated kidnapping. However, "[a] defendant may be convicted of especially aggravated kidnapping under a criminal responsibility theory, regardless of whether there is evidence that he directly participated in the criminal act itself." Phillips, 76 S.W.3d at 12. Applying the standard for criminal responsibility set out previously, we must determine whether the evidence supports a conviction for especially aggravated kidnapping, and, if so, whether Mickens is criminally responsible for it.

The testimony demonstrates Mickens' responsibility for the kidnapping of Marshall Shipp. Shipp expressed concern that he was going to be put "under G.D. arrest" and was forced to come to the September 15 meeting at Mickens' apartment, where the victims were surrounded by Gangster Disciples, some of whom visibly were armed. Mickens was "governor" of the Gangster Disciple South Memphis region, the highest ranking member present when Shipp was kidnapped, and, on at least two prior occasions, had spoken with the overseer, Tony Phillips, about punishing Shipp. The victims were closely escorted from the apartment to the cars. When asked why he left the apartment, Ricky Aldridge responded, "Could have shot me in my back or anything. My life was in danger." Aldridge testified that he could not leave the car because he was "under G.D. arrest." Shipp was surrounded in the park before he was beaten to death. Aldridge was put in a full nelson before he was beaten. Clearly, the evidence was sufficient to show that the victims were unlawfully confined, exposing them to a substantial risk of bodily injury.

Thus, the record contains abundant evidence that, when viewed in the light most favorable to the State, was sufficient to show that Mickens was criminally responsible for the kidnappings: he was the governor of the South Memphis Gangster Disciples; he was present at the meetings where the victims' situations were discussed; he sought, and received, overseer Phillips' permission to kill Shipp; he had the authority to impose Aldridge's kidnapping and beating; and he ordered Matrin Becton to shoot Shipp.

Accordingly, we conclude that the evidence was sufficient for Mickens' conviction for first degree murder in the perpetration of kidnapping.

### C. Voluntary Membership in the Gangster Disciples as a Defense to Especially Aggravated Kidnapping

Mickens and Dixon assert that the evidence is insufficient to support their especially aggravated kidnapping convictions, arguing that the victims, by joining the Gangster Disciples, voluntarily subjected themselves to all gang rules and punishments. Thus, the defendants reason that their conduct did not meet the statutory requirements of kidnapping because, in their opinions, gang

membership granted prior consent to any punishment, including kidnapping, that the gang chose to impose. The effect of this argument, if valid, would be to endow the Gangster Disciples as an entity unto themselves, immune from the criminal laws and with license to punish its members as, within its sole discretion, it deemed necessary. We respectfully disagree that a civilized society can tolerate such conduct or has so empowered the Gangster Disciples.

We conclude that the record supports Mickens' and Dixon's convictions for especially aggravated kidnapping.

## IX. Sentencing

Mickens contends that his sentence was improperly enhanced. In sentencing him, the trial court found no mitigating factors applicable but found five enhancement factors:

> (1) The defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range;
>
> (2) The defendant was a leader in the commission of an offense involving two (2) or more criminal actors;
>
> (5) The defendant treated or allowed a victim to be treated with exceptional cruelty during the commission of the offense;
>
> (8) The defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community;
>
> (11) The felony resulted in death or bodily injury or involved the threat of death or bodily injury to another person and the defendant has previously been convicted of a felony that resulted in death or bodily injury.

Tenn. Code Ann. § 40-35-114(1), (2), (5), (8), (11) (1997). Based on these factors, the trial court imposed a life sentence without the possibility of parole for the first degree murder conviction and two consecutive twenty-two-year sentences for the especially aggravated kidnapping convictions.

When an accused challenges the length and manner of service of a sentence, it is the duty of this court to conduct a *de novo* review on the record with a presumption that "the determinations made by the court from which the appeal is taken are correct." Tenn. Code Ann. § 40-35-401(d). This presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The presumption does not apply to the legal conclusions reached

by the trial court in sentencing the accused or to the determinations made by the trial court which are predicated upon uncontroverted facts. State v. Butler, 900 S.W.2d 305, 311 (Tenn. Crim. App. 1994); State v. Smith, 891 S.W.2d 922, 929 (Tenn. Crim. App. 1994); State v. Bonestel, 871 S.W.2d 163, 166 (Tenn. Crim. App. 1993). However, this court is required to give great weight to the trial court's determination of controverted facts as the trial court's determination of these facts is predicated upon the witnesses' demeanor and appearance when testifying.

In conducting a *de novo* review of a sentence, this court must consider (a) any evidence received at the trial and/or sentencing hearing, (b) the presentence report, (c) the principles of sentencing, (d) the arguments of counsel relative to sentencing alternatives, (e) the nature and characteristics of the offense, (f) any mitigating or enhancement factors, (g) any statements made by the accused in his own behalf, and (h) the accused's potential or lack of potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-103, -210; State v. Scott, 735 S.W.2d 825, 829 (Tenn. Crim. App. 1987).

The party challenging the sentences imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Commission Cmts.; Ashby, 823 S.W.2d at 169. In this case, the defendants have the burden of illustrating the sentence imposed by the trial court is erroneous.

In determining the appropriate sentence for a felony conviction, the sentencing court, if there are enhancement factors but no mitigating factors, may set the sentence above the minimum in that range but still within the range. See Tenn. Code Ann. § 40-35-210(d) (Supp. 1999); State v. Boggs, 932 S.W.2d 467, 475 (Tenn. Crim. App. 1996). There is no mathematical formula of evaluating the enhancement factors to calculate the appropriate sentence. See generally Boggs, 932 S.W.2d at 475. "Rather, the weight to be afforded an existing factor is left to the trial court's discretion so long as the court complies with the purposes and principles of the 1989 Sentencing Act and its findings are adequately supported by the record." Id. at 475-76 (citations omitted).

On appeal, Mickens does not contest application of the enhancement factors applied by the trial court or argue that any mitigating factors should have been applied. He does, however, argue that the proof showed he "did not want to act on the permission to have Shipp killed" and that we should consider his youth in reviewing the sentence. However, as we have stated, the evidence abundantly supports Mickens' convictions, as well as the trial court's sentencing rationale. Accordingly, we conclude that the trial court did not err in setting the length of Mickens' sentences.

We now will consider the claim that the trial court erred in ordering that the sentences of Mickens, Smith, and Jones be served consecutively. Consecutive sentences are imposed at the discretion of the trial court upon its consideration of one or more of the following statutory criteria:

> (1) The defendant is a professional criminal who has knowingly devoted such defendant's life to criminal acts as a major source of livelihood;

(2) The defendant is an offender whose record of criminal activity is extensive;

(3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;

(4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;

(5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

Tenn. Code Ann. § 40-35-115(b) (1997). These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing. Here, the trial court found that factors (2) and (4) applied to all three defendants and factor (1) applied to Mickens and Smith.

In ordering that Mickens' sentences be served consecutively, the trial court found that he was a professional criminal, had a record of extensive criminal activity, and had little or no regard for human life, which the court considered the most significant factor in ordering that the sentences be served consecutively:

And that is, that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. And as I've said on two or three occasions – and I won't belabor the point today – but, certainly, the beating that was administered to this victim was horrible and savage, almost beyond belief.

. . . .

-43-

Someone who's capable of seeking permission from a supervisor, if you will, to have a person executed in our community; someone who's capable of then acting upon that permission and calling a meeting, ordering the rounding up of these individuals, orchestrating all of that, presiding over the meeting and then turning everything over to his henchmen to carry out, I would sure think that would qualify as a dangerous offender. I can't imagine people in a civilized community or civilized society not considering that type of conduct to be dangerous, not considering that type of individual to be a dangerous person. Someone who is so cold as to be able to take those steps and place all that in motion, even though he didn't go out to the park. And I think the proof will bear that out. And I don't dispute that statement by [defense counsel]. I don't think Mr. Mickens was at the park that night. But I think he set in motion the events that led to Mr. Shipp's death and he bears that responsibility. And he's, I think, again, clearly a dangerous offender.

Smith and Jones do not contest the length of their sentences but argue that they should not be served consecutively, the trial court failing to find that consecutive sentences were "reasonably related to the severity of the offenses" or were "necessary to protect the public against further criminal conduct" by the defendants. See State v. Wilkerson, 905 S.W.2d 933, 939 (Tenn. 1995).

In ordering that the sentences of Smith and Jones be served consecutively, the trial court found that both were dangerous with little or no regard for human life and that, in addition, Smith was a professional criminal:

> As to Mr. Smith, the defendant is a professional criminal who has knowingly devoted himself to criminal acts as a major source of his livelihood. I don't see how you can draw any other conclusion.
>
> While it's true he spent much of his life in prison as a juvenile and as an adult, that period of time that he was out of jail, or prison, the record would show that he worked for a grand total of three weeks for the City of Memphis before he left that job.
>
> He has convictions for theft, convictions for burglary, convictions for those types of offense[s]. And so the total absence of any legitimate source of livelihood and the numerous prior convictions, many of them involving theft-related offenses, would lead to no other conclusion, I think, than that he is a professional criminal. And I so find as to Mr. Smith.

-44-

And certainly as to Mr. Smith, the record of criminal activity is extensive, as to Mr. Dixon to a lesser offense, and as to Mr. Jones an even lesser offense. He has the two prior convictions: the heroin conviction and the robbery conviction.

So an argument could be made that that's not extensive. I guess, extensive is a subjective term. And the two convictions may not be extensive, whereas the greater number of convictions that Mr. Smith has, I think, certainly would be extensive.

But those factors, number one as to Mr. Smith and number two as to all three defendants, are really minuscule, are really and truly inconsequential when you get to factor number four, and that is that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high.

Because of the obscene, awful, savage beating that was inflicted by these men on the victim in this case – the jury concluded the same when they concluded in the sentencing hearing that the heinous, atrocious, and cruel factor existed.

Anyone reading the transcript of this case would have to conclude that these are dangerous men. You can't be a human being and perform acts of this sort without being a dangerous individual by anybody's definition.

And beyond that, they – during this sentencing hearing today, as each defendant was being discussed they would be sitting back there smiling. I mean, when [the assistant district attorney general] mentioned – for the record, I'll mention this as one example of what I'm talking about.

When [the assistant district attorney general] mentioned the unbelievable statement and actions of Mr. Smith when he went down in there and told the individuals to keep beating him because the bitch ain't dead yet, each time she mentioned that Mr. Smith's back there smiling.

He was grinning from ear to ear each time she mentioned that as though it were some sort of joke. It's almost beyond comprehension that human beings would be able to participate in a beating of this sort.

And remorse?  [Defense counsel for Jones] alluded to remorse from the sentencing hearing.  I didn't hear any remorse come out of the mouth of any of these three men.

They all took the stand.  And they all made self-serving statements.  And they all tried to, in words, tell the victim's family that they were sorry that the victim died but then immediately were quick to try to absolve themselves of any responsibility for what happened.

Was I down there?  Oh, no, no, no, I was standing out by the car the whole time.  Did I do anything?  Oh, no, no, I didn't hit anybody.  I didn't see anything.  It was MacMarcus.  It was this, that.

They all immediately backpedalled and tried to extricate themselves from any sort of involvement in this incident at all.  Remorse, true remorse would come from one of these men – and it wouldn't be easy.  But in a case of this sort it shouldn't be easy.

But true remorse would come if one of these men had the guts to get on this witness stand and really say, look, it was a horrible thing that happened that night and I saw every bit of it, it was awful, and shed a tear for what he participated in and talk about what he participated in.

True remorse would be to do something like Ricky Aldridge did when he came down here and testified as to what he observed, testified as to this beating that he witnessed.

For one of these men to get on the stand and have the courage to actually apologize for what occurred that night that would be remorse.  But I didn't hear any of that at the sentencing hearing from any one of these men.

So, yes, I think that factor number four clearly exists as to all four of these men.  They are all dangerous men by anybody's definition.  And these sentences should be served consecutively to one another and consecutively to the life sentence that they received, which in Mr. Jones' case would be forty years consecutive to the life sentence; in Mr. Dixon's case, sixty-five years consecutive; and in Mr. Smith's case, eighty years consecutive.

All three of these defendants had prior criminal records. At the sentencing hearing, the State advised the trial court that, as an adult, Mickens had previous felony convictions for aggravated assault, possession of a prohibited weapon, and reckless endangerment with a deadly weapon; additionally, as a juvenile, he had felony convictions for grand larceny of an automobile, possession of cocaine with intent to sell, and theft of property over $500, and a Class A misdemeanor conviction for carrying a dangerous weapon. Smith had prior convictions as an adult for three aggravated assaults, two felony thefts, reckless endangerment with a deadly weapon, and burglary of a motor vehicle, as well as three felony and one misdemeanor convictions as a juvenile. Jones had a previous federal felony drug conviction and a conviction as a juvenile for robbery.

The record abundantly supports the finding of the trial court that these defendants are dangerous offenders whose behavior shows little or no regard for human life, as is apparent from the gruesome details of Shipp's fatal beating.

Additionally, the record supports a finding that Mickens and Smith are professional criminals and that crime is their major source of livelihood. Mickens was the governor for the South Memphis Gangster Disciples, and he reported that he has never had gainful employment. During the periods when Smith was not incarcerated, it appears that his only legal employment lasted for three weeks. He stated that he has been a member of the Gangster Disciples all of his adult life.

We conclude, upon *de novo* review, that consecutive sentencing is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(4) (1997). This issue is without merit.

## X. Cumulative Error

The defendants argue that even if none of the errors is determined to be prejudicial by itself, their cumulative effect mandates a new trial. However, since we have determined that the trial court did not err in the rulings raised on appeal, there is no cumulative error for us to consider.

## CONCLUSION

Based upon the foregoing authorities and reasoning, we affirm each defendant's convictions and sentences.

_____
ALAN E. GLENN, JUDGE