IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs September 13, 2005

## WILSON NEELY v. STATE OF TENNESSEE

**Direct Appeal from the Criminal Court for Shelby County**
**No. P-26988    John P. Colton, Jr., Judge**

------------

**No. W2004-03006-CCA-R3-PC  - Filed January 4, 2005**

------------

Petitioner appeals the dismissal of his petition for post-conviction relief arguing that his trial counsel rendered ineffective assistance of counsel during the preparation of his case. Specifically, Petitioner contends that trial counsel's failure to interview and call Andre Jackson as a witness at trial was deficient conduct. After a thorough review of the record, we conclude that Petitioner has failed to show that he was prejudiced by any deficiencies in his trial counsel's performance, and we thus affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3, Appeal as of Right; Judgment of the Criminal Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and DAVID G. HAYES, J., joined.

C. Anne Tipton, Memphis, Tennessee, for the appellant, Wilson Neely.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Andre Thomas, Assistant District Attorney General, for the appellee, the State of Tennessee.

### OPINION

### I. Background

Following a jury trial, Petitioner was convicted of first degree premeditated murder and sentenced to life imprisonment with the possibility of parole. Petitioner argued on appeal that his conviction was improperly based upon the uncorroborated and insufficient testimony of his accomplices. Petitioner's conviction was upheld on appeal. *State v. Wilson Neely*, No. W2001-01327-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 724, at **1, 18 (Tenn. Crim. App., at Jackson, Aug. 23, 2002), *perm. to appeal denied* (Tenn. Dec. 16, 2002).

The facts surrounding Petitioner's conviction were summarized by this Court in the direct appeal as follows:

This case arises from the shooting of Billy Ray Brown. It appears from the record that the intended target of the crime was Bertram Johnson; however, Mr. Brown became the unintended victim. The issue presented in this case pertains to accomplice testimony. Thus, it is essential to understand which components of the state's case were provided by the various witnesses.

Karen Seymour, who by all accounts was not involved in the crime in question, testified that on the evening of October 29, 1997, she visited Bertram Johnson at a "dope house" at 1010 Cella Street in Memphis. Although Mr. Johnson did not reside at 1010 Cella, he spent time there. Mr. Johnson is the father of Ms. Seymour's daughter. Mr. Johnson became upset that Ms. Seymour was accompanied by a male friend. Mr. Johnson became verbally abusive and took $50 from her. When she demanded that he return the money, he refused and brandished a weapon.

Ms. Seymour went to the home she shared with her mother and her brother, Robert Seymour. She told her brother, who was a member of the Gangster Disciples, what had happened. During the evening, other members of the Gangster Disciples arrived at the Seymour residence. Ms. Seymour identified these individuals as Albert Wilson, Ira Farris, Kevin Porter, and the defendant Wilson Neely. These gentlemen all left together, and Robert Seymour returned 30 minutes to an hour later.

Kevin Porter, who denied any affiliation with the Gangster Disciples, testified that he, Albert Wilson, and Ira Farris went to the Seymour residence on the date in question. Karen Seymour, Robert Seymour, Brian Bison, and the defendant Wilson Neely were also present that evening. Porter claimed that he was in the back room with Karen Seymour most of the time. However, he was aware that there was a conversation going on in the living room among Robert Wilson, Ira Farris, Brian Bison and the defendant. Porter went into the living room from time to time and heard bits of the conversation. According to Porter, Robert Seymour said that he needed to "ride on this n----- and see what's up." Porter was present when the defendant was involved in telephone conversations in which the defendant was attempting to locate Bertram Johnson.

Porter claimed that as the group of men left the Seymour home, he believed they were going to a nightclub. Porter, Al Wilson, Robert Seymour and Ira Farris rode in Porter's Pontiac Parisienne, and the defendant, Brian Bison and an individual whom Porter did not know were in a small, green car. During the ride, one of the passengers in Porter's vehicle suggested that they go to Cella Street. Porter testified that he thought the purpose of going to Cella Street was to get some "weed." As they were approaching Cella Street, Porter heard a click and looked into the back seat. He

-2-

saw that Robert Seymour had a Tec 9 or Uzi firearm. He then noticed that Ira Farris had a small, nine millimeter weapon, and Al Wilson had a laser-site Beretta. Porter claimed that he had not seen any weapons prior to this point in the evening. Porter testified that he thought his passengers, whom he claimed not to know well, might be about to carjack him. He claimed to have inquired what was going on, but one of the passengers told him it was "nothing" and to continue on his course.

According to Porter, the defendant was already parked on Cella Street as he approached. The defendant was out of his vehicle and in the yard of 1010 Cella. As Porter started to pull over, the defendant gave some type of hand signal, and Albert Wilson jumped out of Porter's car before it was fully stopped. Gunfire erupted. Farris and Seymour exited Porter's car, and Porter claimed that he ducked down into the seat. Porter claimed that he was afraid to drive away because he knew that if he fled, he would have to face the other men later and justify having left them. Porter heard at least 25 shots, a pause, and then five or six more shots. He heard someone yell, "Hold up, man. Damn, what's up Wilson?" Porter looked into his rear-view mirror, and about twenty feet away, he saw the victim's legs extending from behind the small, green car. Porter testified that the defendant walked to the victim, who was on the ground, and stood over him. With a larger handgun, the defendant shot the victim five or six times. The occupants of both cars then fled in the vehicles in which they had arrived. Porter maintained that he was afraid he would be shot, so he drove away. As they neared an intersection on Cella, the police began following them. Porter claimed to be concerned that his passengers would begin shooting at the police. He fled for [a] short distance, hit a tree, and fled on foot. He claimed that he intentionally hit the tree because he was flustered and was concerned that he would be killed in the course of a chase. Porter hid in some bushes, and he was apprehended shortly thereafter.

At trial, Porter acknowledged that he had given an initial statement in which he was not entirely forthcoming. He explained that he was afraid of retaliation. Later, however, he gave a more detailed statement. Porter maintained at trial that he had no advance knowledge that the purpose of going to Cella Street was to cause harm to anyone. He also maintained that he did not have a weapon with him and that he did not fire a weapon during the shooting. At the time of the defendant's trial, Porter was under indictment for facilitation of first-degree murder. He denied that he had any sort of plea bargain arrangement with the state in exchange for his testimony.

Travis Sugars testified that he was present at 1010 Cella and saw Karen Seymour and Bertram Johnson talking. Later that same evening, Sugars was present when Robert Seymour came to 1010 Cella to leave a threat for Bertram Johnson. Although Johnson was not present at the time, he returned after Mr. Seymour departed. Sugars observed Johnson receive a call on his cellular telephone and become involved in an argument.

Ira Farris testified that like the defendant, he is under indictment for first-degree murder relative to the shooting. For the most part, his testimony was consistent with that given by Kevin Porter. It differed, however, in certain significant respects.

Farris identified himself, Porter, the defendant, Brian Bison, Robert Walker, Albert Wilson, Robert Seymour, and an individual named Andre as additional members of the Gangster Disciples. He admitted that there was a conversation about the earlier incident between Karen Seymour and Bertram Johnson and that it was decided that the group needed to straighten the matter out. He specifically identified the defendant as being present during this conversation. Contrary to Porter's testimony, Farris said that Bison was not present for the conversation, although he said that Bison joined the group outside the Seymour residence and traveled with them to Cella Street. Farris testified that none of this conversation specifically pertained to killing or using weapons. Farris identified Robert Walker and Andre as being present later in the evening at the Seymour residence.

Farris described the criminal episode much as had Porter, and he provided additional details. He recalled seeing the defendant in a heated conversation with Bertram Johnson before the shooting began. Farris did not see Johnson with a gun, although he thought from Johnson's movements that he had a gun. According to Farris, there were about six people on the lawn of 1010 Cella, all of whom "hit the ground" when the shots began. Farris contradicted Porter's testimony that gunfire began immediately as they arrived. After most of the shooting was over, Farris saw the defendant backing up. The defendant and the victim bumped into each other; the defendant turned around and fired more shots. The victim fell to the ground almost immediately.

Law enforcement witnesses provided additional evidence. A Memphis Police Department officer testified about various weaponry and other physical evidence found at the scene. An agent from the Tennessee Bureau of Investigation testified as an expert in firearms identification. She identified the weapons and ammunition recovered from the scene and identified the weapons from which certain items of ammunition had been fired. Additionally, she testified that gunshot residue samples taken from Kevin Porter and Travis Sugars were inconclusive, while the sample from Andre Jackson was negative and from Ira Farris was positive.

The county's assistant medical examiner testified about the autopsy she performed on the victim. She identified the gunshot wounds he sustained, and she opined that he was shot from more than two feet due to the absence of stippling from gunpowder. Further, she testified that fragments of asphalt found in a ground wound were consistent with the victim having been shot as he was lying on the ground.

*Wilson Neely*, 2002 Tenn. Crim. App. LEXIS, at \*\*1-9.

## II. Post-Conviction Hearing

Petitioner testified that his family retained his trial counsel shortly after his arrest on the charged offense in April 2000. Petitioner said that trial counsel had represented him numerous times on various criminal charges, but Petitioner had never gone to trial on the prior charges. Instead, he had entered guilty pleas.

Petitioner said that he did not meet with trial counsel between April and June 2000, when a plea of not guilty was entered, although he attempted to contact trial counsel by telephone during this period of time. Petitioner said that his trial counsel told him not to worry about the case because trial counsel had been trying criminal cases for more than forty years. Petitioner said that he met with his trial counsel about four times between June and the commencement of trial in late October 2000, and two or three of the meetings were held the week before trial. Petitioner said that he was aware that trial counsel communicated with members of Petitioner's family.

Petitioner said that trial counsel filed a motion for discovery, and a hearing on the motion was held on the morning of trial. The trial court ordered the State to turn over its file to trial counsel. Petitioner said that he assumed his trial counsel had reviewed the documents, because trial counsel copied the contents of the file and presented the copies to Petitioner the next day. Petitioner said that after he reviewed the State's evidence, he asked trial counsel to interview Andre Jackson, Bertram Johnson, and Tracy Sugars, and he told trial counsel where to find these men. Petitioner believed that trial counsel had subpoenaed Mr. Jackson to testify at trial, but Mr. Jackson was not called as a witness. Petitioner was aware that trial counsel talked to the attorney of one of his co-defendants, but he did not know whether or not trial counsel had talked with the other co-defendants' attorneys. Petitioner testified that trial counsel did not visit the crime scene, did not hire an investigator to assist him, and did not discuss the facts of the case with Petitioner. Petitioner said he believed trial counsel's assistance would have been more effective had trial counsel received the State's evidence before the day of trial.

On cross-examination, Petitioner said that he never told trial counsel that he wanted to proceed to trial instead of entering into plea negotiations. He conceded, however, that trial counsel told him the State would not consider a plea bargain, and Petitioner was aware that meant that there was going to be a trial.

On redirect examination, Petitioner said that trial counsel was appointed to represent him on appeal. Petitioner said that trial counsel did not discuss with him the issues which trial counsel intended to raise on appeal, but he said that trial counsel provided him with a copy of his brief. Petitioner said that he learned that his conviction had been affirmed on appeal, and that the Supreme Court subsequently denied Petitioner's application for permission to appeal, from someone in the prison law library instead of his trial counsel.

Andre Jackson testified at the evidentiary hearing that he gave a statement to the police on November 3, 1997, in which he said that Petitioner was not armed during the shooting on Cella

-5-

Street, and that he did not see Petitioner fire a gun at any point during the incident. Mr. Jackson provided a detailed description to the police of the man who shot Mr. Brown, but he said that he did not know the shooter's name. Mr. Jackson testified that the shooter he described in his statement was not Petitioner. Mr. Jackson spoke with the prosecutor "a couple weeks" before trial. Mr. Jackson said that he was subpoenaed by Petitioner's trial counsel to testify at trial, but trial counsel never interviewed him. Mr. Jackson was incarcerated on an unrelated charge at the time of Petitioner's trial, and he was transported to the courtroom two or three times in anticipation of testifying. Mr. Jackson said that he had known Petitioner since they were teenagers.

Petitioner's trial counsel testified that he had been an attorney for more than forty years and had tried between twenty and forty cases involving murder charges. Trial counsel said he had known Petitioner about fifteen or twenty years. Trial counsel said that a significant amount of time passed between the shooting and when Petitioner was apprehended by the police. Trial counsel agreed that he frequently communicated with Petitioner through Petitioner's mother.

Trial counsel said that he did not remember seeing Mr. Jackson's statement to the police. Trial counsel believed, however, that Mr. Jackson's potential testimony would not have helped the defense. Mr. Jackson's statement at least put Petitioner at the scene of the crime, and it was Petitioner's defense that he had not been present on Cella Street. Trial counsel said that he reviewed the statements of the State's witnesses and the co-defendants.

On cross-examination, trial counsel stated that he did not hire an investigator because the only witnesses were Petitioner's co-defendants and Ms. Seymour. Trial counsel recollected that he reviewed the State's discovery between June and November. He attempted to interview Bertram Johnson, but the injuries Mr. Johnson received during the shooting prevented him from testifying at trial.

Trial counsel reiterated on cross-examination that he did not remember reviewing or seeing Mr. Jackson's statement prior to trial, but he agreed that it would have been reasonable to interview Mr. Jackson as a potential witness. Trial counsel stated that Mr. Jackson's testimony would have been more important had the State sought the death penalty. Trial counsel acknowledged that although the State pursued a theory of criminal responsibility as to the culpability of the co-defendants, the State's theory at trial was that Petitioner was the individual who shot Mr. Brown. Trial counsel stated, however, that he did not believe that the absence of Mr. Jackson's testimony was prejudicial because Mr. Jackson placed Petitioner at the scene, and the State could have argued that Petitioner was criminally responsible for Mr. Brown's death. Trial counsel said that he would not have handled the case differently even if he had interviewed Mr. Jackson.

The evidentiary hearing was continued to allow Petitioner's post-conviction counsel time to produce Robert Seymour as a witness. On the second day of the hearing, trial counsel was recalled to the stand. Trial counsel stated that, upon reflection, he felt that if he had seen Mr. Jackson's statement prior to trial, he would have called him to testify. He recollected that he initially believed that Mr. Jackson was another co-defendant because he was incarcerated at the time of Petitioner's

trial. Acting under this assumption, and without reviewing his statement, trial counsel said he would not have called Mr. Jackson to testify because all of Petitioner's co-defendants identified Petitioner as the shooter. Trial counsel stated, "I certainly would have interviewed [Mr. Jackson] to satisfy my mind that he was telling the truth or telling a lie. If I felt like he was pretty close to telling the truth, I would have put him on. If I felt like he was lying, I would have had to take some sort of different action. I would have done something."

Robert Seymour testified that he pled guilty to the lesser offense of attempted second degree murder as a result of his role in the incident. Mr. Seymour said that the State asked him to testify, but did not guarantee him a certain sentence prior to Petitioner's trial. Mr. Seymour said he was sentenced to ten years at the guilty plea submission hearing which occurred after Petitioner was convicted.

## III. Ineffective Assistance of Trial Counsel Claims

### A. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-210(f) (1997). However, the trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to de novo review. *Id.*; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below "the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State,* 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland,* 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id.* at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State,* 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id.* Failure to satisfy either prong will result in the denial of relief. *Id.* Accordingly, this Court need not address one of the

components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

### B. Failure to Communicate

Petitioner contends that his trial counsel's assistance was ineffective because he failed to meet with Petitioner until shortly before trial, and because he did not discuss with Petitioner trial strategy or the facts of the case during these meetings. Trial counsel testified that it was his recollection that he had discussed the case with Petitioner prior to trial, and he stated that he also felt like he was communicating with Petitioner when he met with Petitioner's mother. Trial counsel stated that he received the State's evidence prior to trial. The State's case-in-chief was based on the co-defendants' and Ms. Seymour's testimony, and trial counsel reviewed the statements these witnesses made to the police. The post-conviction court found that Petitioner failed to show that trial counsel's communication with Petitioner prior to trial fell below reasonable standards or that Petitioner was prejudiced by his trial counsel's conduct. Based on our review, we conclude that the evidence does not preponderate against the post-conviction court's finding that trial counsel rendered effective assistance in this regard. Petitioner is not entitled to relief on this issue.

### C. Failure to Interview or Call as a Witness Andre Jackson

Petitioner argues that his trial counsel rendered ineffective assistance of counsel because he did not interview Mr. Jackson or call Mr. Jackson as a witness at trial. According to the trial transcript, trial counsel informed the trial court in a hearing out of the presence of the jury that he had an unserved subpoena for Andre Jackson.

[THE COURT]: A witness we're holding in the jail.

[TRIAL COUNSEL]: Right. I've got an unserved subpoena back at the office, but —

[THE COURT]: I will tell the clerk that [Mr. Jackson] is not to be released, and we can bring him up tomorrow —

[TRIAL COUNSEL]: Now, he's got court tomorrow. He told Sergeant Moore he has court somewhere tomorrow in the system, and I don't believe – I don't know if the State's going to use him or not, but quite frankly, I don't know what we're going to do until I hear all the proof —

[THE COURT]: Sure.

[TRIAL COUNSEL]: –and so I just wanted to let you know –

-8-

[THE COURT]:        We'll keep him around . . .

. . .

[PROSECUTOR]:        I can tell [trial counsel], he's hoping I will call [Mr. Jackson], but the answer is I don't think in this world that I will call Mr. Jackson.

Trial counsel testified at the post-conviction hearing that he did not remember seeing Mr. Jackson's statement to the police. Mr. Jackson's statement was introduced as an exhibit at the post-conviction hearing. In his statement, Mr. Jackson stated that he did not know the name of Mr. Brown's killer, but he described the shooter as approximately five feet, nine inches tall, and wearing a black jacket and black skull cap. Mr. Jackson's statement provided the following version of the sequence of events leading up to Mr. Brown's killing:

[MR. JACKSON]:        I was coming up Cella, Michael Taylor told me that [Bertram Johnson] was inside and I wanted to go holler at him. I went inside to holler at [Mr. Johnson] for about 5, 10, no more than 15 minutes. [A] knock on the door occurred, which [Petitioner] knocked on the door. I followed [Mr. Johnson] out the door about to the end of the driveway.

Moments later, the individuals [sic] came running around the corner, armed with the semiautomatic weapon. He say, "Where my [____] dope at . . . ." [Mr. Johnson] run in the house and locked the door. The guy with the semi-automatic run up to the door releasing shots, like a madman, hollering, "Every [____] going to die!" Started back from the way he came and [Mr. Brown] must have got in his way. Shot [Mr. Brown], down to the ground [Mr. Brown] went, he stood over [Mr. Brown] and released several other shots into [Mr. Brown].

Seconds later, another individual eased up beside the white car, which [sic] I was standing, and shot me one time in the head. I laid down on the ground and played possum. I heard a car drive off. [Mr. Johnson] and his crew I guess, well, it was his uncle and his little nephew, fled to the car hollering, "Come on, let's go!"

I got up to run toward the car with these individuals and suddenly, I seen [sic] the police car. I flagged the police

-9-

down and told them that I had been shot in the head. He asked me to lay down and wait for an ambulance. That's all.

[OFFICER]: Do you know why this shooting occurred?

[MR. JACKSON]: No.

[OFFICER]: What was said between [Mr. Johnson] and [Petitioner]?

[MR. JACKSON]: The only thing [Petitioner] said to [Mr. Johnson] was, "Why you coming all outside with the pistol in your hand."

[OFFICER]: Did [Mr. Johnson] have a pistol in his hand when he came outside?

[MR. JACKSON]: Yes.

[OFFICER]: Did [Petitioner] have a pistol in his hand?

[MR. JACKSON]: No.

[OFFICER]: What did [Petitioner] do when the shooting started?

[MR. JACKSON]: Disappeared. I was running the opposite direction, so I really don't know what [Petitioner] did. When I looked back, [Petitioner] wasn't there.

There was some corroborating testimony at trial that another individual was near Mr. Brown when he was shot. Mr. Farris testified that he saw Petitioner "backing up because . . . the shooting went on for maybe a minute or so and . . . everybody [was] coming back across the street where the car [was] at. So that's when I seen [sic] [Petitioner] backing up, and he bump[ed] into . . . [Mr. Brown]. Mr. Farris then testified:

[PROSECUTOR]: Was anybody else around where [Mr. Brown] and [Petitioner] was [sic]? Did you see anybody else standing right there?

[MR. FARRIS]: Yes, Robert Walker was near. It was like Robert Walker and [Petitioner]. They was [sic] like right there, and [Mr. Brown] was right there.

[PROSECUTOR]: Did you ever see Robert Walker fire any shots?

[MR. FARRIS]: No, but he did get out the car, and he did have a gun.

-10-

Mr. Farris testified at the jury trial on cross-examination that Mr. Walker was "maybe about 5 foot [sic] and 9 inches" tall. He stated that Mr. Walker was Chief of Security for the Memphis Gangster Disciples whose job "was to enforce the Gangster Disciple law."

Faced with Mr. Porter's and Mr. Farris' testimony identifying Petitioner as the shooter, trial counsel's theory of defense at trial was to attack the State's case-in-chief through cross-examination, which, based on our review of the trial transcript, was ably and thoroughly conducted. The information contained in Mr. Jackson's statement to the police, however, would have at least potentially allowed trial counsel to investigate the merits of a theory of defense based on identity; that is, that Mr. Walker, not Petitioner, killed Mr. Brown. Trial counsel testified on the second day of the evidentiary hearing that if he had seen Mr. Jackson's statement, he would have interviewed Mr. Jackson to satisfy himself as to whether or not Mr. Jackson was telling the truth.

That is not to say, however, as Petitioner argues, that trial counsel's assistance was necessarily deficient because he failed to call Mr. Jackson as a witness. Based on the other evidence presented at trial, it is clear that there were some material omissions from Mr. Jackson's statement which would have raised credibility issues with his testimony had he testified. Mr. Farris testified that the man whom he knew only as "Andre" was also a member of the Gangster Disciples. Mr. Farris said that Andre met with the other men at Mr. Seymour's house prior to the confrontation with Mr. Brown, and then Andre drove Petitioner and Mr. Walker to Cella Street in his car.

In addition, trial counsel testified that Petitioner's defense was based on his absence from the crime scene. Whatever benefit might have been obtained from Mr. Jackson's potential testimony, Mr. Jackson's statement placed Petitioner on Cella Street immediately prior to the shootings and directly contradicted Petitioner's defense.

Nonetheless, whether or not trial counsel would have ultimately decided to call Mr. Jackson as a witness, trial counsel's admitted failure to investigate Mr. Jackson's potential testimony is problematic. We will not second guess trial counsel's strategic decisions if such strategy was based on adequate and reasonable investigation. *See Henley*, 960 S.W.2d at 579; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). However, "[d]efense counsel 'must conduct appropriate investigations, both factual and legal,' and 'must assert them in a proper and timely manner.'" *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002) (quoting *Baxter*, 523 S.W.2d at 932, 935). This duty includes "attempting to obtain information in the possession of the prosecution and law enforcement officials" and "raising all available claims, issues and defenses." *State v. White*, 114 S.W.3d 469, 477 (Tenn. 2003). "Trial counsel has a duty to use witnesses who may be of assistance to the defense." *State v. Zimmerman*, 823 S.W.2d 220, 227 (Tenn. Crim. App. 1991). Trial counsel testified that he did not believe that Mr. Jackson's statement had been withheld from him. Based on our review, we conclude that trial counsel's performance probably fell below reasonable standards when he overlooked Mr. Jackson's statement, assumed that Mr. Jackson was an accomplice, and failed to at least interview him when Mr. Jackson was available in confinement.

Nonetheless, a showing that trial counsel's representation fell below a reasonable standard, by itself, is insufficient to support a finding that the petitioner's Sixth Amendment right to trial counsel was violated. *Strickland*, 466 U.S. at 691, 104 S. Ct. at 2066. The petitioner must demonstrate that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.* at 695, 104 S. Ct. at 2970. In the case of failure to investigate or present a witness, the omitted evidence must be significant, but not necessarily lead to an acquittal. *See Hicks v. State*, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998). "[A] reasonable probability of being found guilty of a lesser charge, or a shorter sentence, satisfies the prejudice requirement of *Strickland. Id.* (citing *Zimmerman*, 823 S.W.2d at 227).

The State argues in the case *sub judice* that even if Petitioner did not fire the shots that killed Mr. Brown, Petitioner's conviction of premeditated first degree murder could have been supported under a theory of criminal responsibility. "A person is criminally responsible as a party to the offense if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." Tenn. Code Ann. § 39-11-401(a). A person is criminally responsible for the conduct of another if "[a]cting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). A defendant may be convicted of first degree premeditated murder under a theory of criminal responsibility. *See State v. Mickens*, 123 S.W.3d 355, 391-92 (Tenn. Crim. App. 2003).

In *Mickens*, four defendants, all members of the Gangster Disciples, were convicted of various offenses resulting from the kidnapping of two other members of the gang which led to one of the victims' death. Defendant Jones was convicted of first degree premeditated murder under a theory of criminal responsibility. This Court found that "[i]t was Jones who told [the victim] to 'get [his] ass in [Jones'] car' when [the victim] was abducted and Jones who, witnesses testified, retrieved the murder weapons from his trunk, which Jones later admitted." *Id.* at 390. Based on the evidence presented at trial, this Court found the evidence sufficient to support defendant Jones' conviction for first degree premeditated murder under a theory of criminal responsibility. *Id.* at 391-92.

The confrontation leading to Mr. Brown's death in the instant case began with an altercation between Bertram Johnson and Karen Seymour. Ms. Seymour told her brother, Robert, that Mr. Johnson had taken her money and brandished a gun at her and her children. Ms. Seymour, Mr. Porter, and Mr. Farris testified that Petitioner was one of the group of men who gathered at the Seymour residence after Ms. Seymour told her brother about Mr. Johnson's conduct. Various witnesses identified Petitioner, Mr. Seymour, Mr. Wilson, Mr. Porter, Mr. Bison, and Mr. Farris as members of the Gangster Disciples. Mr. Porter said that Petitioner made a telephone call from Mr. Seymour's house, and he heard Petitioner ask whether Mr. Johnson was there. The men then left the house in two vehicles. Petitioner's vehicle arrived at Cella Street first. Mr. Jackson said in his statement that Petitioner knocked on the door of the Cella Street house, and Mr. Johnson went outside in response to the knock. Mr. Porter testified that Petitioner was in the yard in front of the Cella Street house when he arrived, that Petitioner gave a hand signal, and Mr. Wilson jumped out

of Mr. Porter's car and started shooting. Mr. Farris saw Petitioner talking with Mr. Johnson in the yard, and then Petitioner turned around and started walking back to the car when Mr. Johnson reached for what Mr. Farris assumed was a gun. Although somewhat dissimilar in details, and notwithstanding Mr. Jackson's statement that someone other than Petitioner actually fired the shots that killed Mr. Brown, the testimony of all three men identified Petitioner as the one who lured Mr. Johnson out of the Cella Street house and into the front yard immediately prior to the shooting which ultimately led to Mr. Brown's death.

Under the theory of criminal responsibility, a defendant's presence and companionship with the perpetrator of the crime before and after the crime are circumstances from which one may infer the defendant's participation. *See State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998). The defendant need not have taken a physical part in the crime; mere encouragement of the principal will suffice. *Id.*; *State v. McBee*, 644 S.W.2d 425, 428 (Tenn. Crim. App. 1982). To be criminally responsible for the acts of another, "[i]t is necessary that the defendant 'in some way associate himself with the venture, act with knowledge that an offense is to be committed, and share in the criminal intent of the principal in the first degree.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *Hembree v. State*, 546 S.W.2d 235, 239 (Tenn. Crim. App. 1976)).

Whether Petitioner was convicted as the principal or as criminally responsible for Mr. Brown's premeditated murder, his conviction offense would remain first degree premeditated murder. *See* Tenn. Code Ann. § 39-11-401(b) ("Each party to an offense may be charged with commission of the offense.") A defendant convicted of first degree premeditated murder is subject to punishment by death, imprisonment for life without the possibility of parole, or imprisonment for life. *Id.* § 39-13-202(c). Because Petitioner was sentenced to life imprisonment with the possibility of parole for his first degree premeditated murder conviction, there is not a reasonable probability that he would have received a lesser sentence as a result of being convicted of the offense under a theory of criminal responsibility rather than as a principal.

In order to show prejudice, therefore, Petitioner would have to show that there was a reasonable probability that he would have been found guilty of a lesser offense had trial counsel called Mr. Jackson as a witness. *See Hicks*, 983 S.W.2d at 246; *Zimmerman*, 823 S.W.2d at 227. Facilitation of first degree premeditated murder, a Class A felony, is a lesser included offense of first degree premeditated murder. *Burns*, 6 S.W.3d at 470. As a Class A felony, a facilitation conviction is subject to a sentencing range between fifteen and twenty-five years if Petitioner were classified as a Range I, standard offender. Tenn. Code Ann. §§ 39-11-117(a)(1); 39-11-403(b); 40-35-112(a)(1).

"A person is criminally responsible for the facilitation of a felony if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." *Id.* § 39-11-403(a). After a thorough review of the record, and including consideration of Mr. Jackson's statement to the police, which was not introduced into evidence at trial, we conclude that there is not a reasonable probability that a rational trier of fact would have concluded that

Petitioner *merely* (and knowingly) furnished substantial assistance in the commission of the offense while *lacking* the intent to promote or assist in the offense. *See id.*; *State v. Robinson*, 146 S.W.3d 469, 487 (Tenn. 2004).

Based on the foregoing, even if Mr. Jackson had testified at trial that Petitioner did not actually fire the shots that killed Mr. Brown, the State could have pursued a theory of criminal responsibility to support a conviction of first degree premeditated murder. Accordingly, we conclude that Petitioner has failed to show that he was prejudiced by trial counsel's failure to interview Mr. Jackson prior to trial. Petitioner is not entitled to relief on this issue.

## CONCLUSION

After a through review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE